Bernard T. HALLORAN,
Plaintiff–Appellee,

v.

VETERANS ADMINISTRATION,
Defendant–Appellant.

Nos. 88–6180, 89–2055
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

June 6, 1989.

Leonard Schaitman and Susan Sleater, Attys., Civ. Div. Appellate Staff, Dept. of Justice, Washington, D.C., for defendant-appellant.

Bernard T. Halloran, Houston, Tex., pro se.

Thomas C. Halloran, Lexington, Mass., for plaintiff-appellee.

Before POLITZ, KING and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

During an investigation into alleged fraud by a United States government contractor, Veterans Administration (VA) officials surreptitiously taped a series of conversations among undercover government agents, employees of the contractor, and third parties. In response to a request under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, for transcripts of the tapes, the government released copies of the transcripts from which it deleted (1) identifying information regarding the suspects and third parties and (2) medical information about one particular third party. The district court ordered the government to produce unredacted copies of the transcripts; because we conclude that the information withheld by the government comes within the FOIA exemption for "records or information compiled for law enforcement purposes [the disclosure of which] ... (C) could reasonably be expected to constitute an unwarranted invasion of privacy," *id.* § 552(b)(7)(C), we reverse and render.

### I.

#### A.

In 1984, Santa Fe Engineers, Inc. ("Santa Fe"), contracted with the VA to renovate two VA medical centers; Santa Fe in turn subcontracted a portion of this work relating to asbestos removal to All Professional Services, Inc. (APS). During the course of the work, APS alleged, Santa Fe sent a letter to APS suggesting that the two firms bill the government for more than the contract price—$30 per cubic foot removed—and split the excess. APS perceived this suggestion as a kickback proposal, and so informed the VA Office of Inspector General.

In response to the tip, the Inspector General, working with APS employees, began an undercover investigation of Santa Fe. During the investigation, the Inspector General had APS employees or an undercover federal agent wear hidden microphones to tape, secretly, conversations with Santa Fe employees. Six transcripts, totaling 198 pages, were made from these tapes.

After the investigation was completed, the Inspector General recommended to the Justice Department that criminal indictments be sought against Santa Fe and three of its employees. The United States Attorney's Office, after reviewing the evidence and the Inspector General's recommendation, declined to prosecute, citing, *inter alia*, "the lack of sufficient evidence."

#### B.

Bernard Halloran, an attorney, began representing APS in 1985, while the investigation was underway. During this time, Halloran, on behalf of APS, sought to collect money from Santa Fe for work performed by APS on, *inter alia*, the VA project. Currently, the dispute between APS and Santa Fe over the amount due APS for its work on the VA project is the subject of a civil lawsuit.

Pursuant to the FOIA, Halloran requested that the VA release to him, *inter alia*,

the transcipts of the conversations secretly taped during the Inspector General's investigation. Although it notified Halloran that it was processing his request, the VA failed to produce the transcripts within the statutory period, and Halloran filed the instant suit. Shortly thereafter, the VA released redacted copies of the transcripts; these redactions are the subject of this appeal.

The VA made two sets of deletions from the transcripts. First, it deleted the names of, and other identifying information relating to, forty-two individuals, i.e., the three unindicted suspects of the investigation, other persons participating in the conversations, and third parties mentioned in the conversations, including one federal employee who was not involved in the investigation. The VA did not delete from the transcripts the names of APS employees mentioned in Halloran's FOIA request or the federal special agents who worked with APS during the investigation. Second, the VA deleted medical information, relating to one person, that had been revealed during the course of one of the conversations.

Halloran objected to the deletions, contending that the information deleted was not exempt from disclosure under the FOIA. After performing an *in camera* inspection of the unedited transcripts, the district court concluded that the FOIA exemptions under which the VA sought to justify the deletions were not applicable. Accordingly, it ordered the VA to produce the deleted information.[1] The VA appeals.

## II.

The VA argues that its refusal to release the identifying and medical information is justified under both FOIA exemption 6, which excepts from disclosure "personnel and medical files and similar files the dis-

closure of which would constitute a clearly unwarranted invasion of privacy," 5 U.S.C. § 552(b)(6), and exemption 7(C), which excepts "records or information compiled for law enforcement purposes ... [the disclosure of which] could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). We conclude that the district court erred by rejecting the VA's argument that the deleted information was protected from disclosure under exemption 7(C); for that reason, we do not reach the issue of whether the same information is also within the scope of exemption 6.

## A.

Although the FOIA embodies "a general philosophy of full agency disclosure," *Department of the Air Force v. Rose*, 425 U.S. 352, 360, 96 S.Ct. 1592, 1598–99, 48 L.Ed.2d 11 (1976) (quoting S.Rep. No. 813, 89th Cong., 1st Sess. 3 (1965)), the Act also reflects Congress's awareness that other concerns may require a departure from this general philosophy:

> The Act expressly recognizes ... that public disclosure is not always in the public interest and consequently provides that agency records may be withheld from disclosure under any one of the nine exemptions defined in 5 U.S.C. § 552(b).

*Baldrige v. Shapiro*, 455 U.S. 345, 352, 102 S.Ct. 1103, 1108, 71 L.Ed.2d 199 (1982). One of the most important concerns counterbalancing the public's general interest in disclosure is the desire to protect individuals' privacy interests; it is for this reason that two out of the nine exemptions, exemptions 6 and 7(C), refer explicitly to "privacy," with several others motivated by privacy concerns as well.[2]

---

1. The district court also awarded Halloran attorneys' fees, finding that the position of the VA in protecting the deleted information lacked any legal basis. In a separate appeal, No. 89–2055 (which, by the court's own motion, we have consolidated with this appeal), the government contests this award as well.

2. *See* 5 U.S.C. § 552(b)(4) (exempting from disclosure "trade secrets and commercial or finan-

cial information obtained from a person and privileged or confidential"); *id.* § 552(b)(7)(D) (exempting from disclosure law enforcement records that "could reasonably be expected to disclose the identity of a confidential source"); *id.* § 552(b)(7)(F) (exempting from disclosure law enforcement records that "could reasonably be expected to endanger the life or physical safety of any individual").

Congress contemplated that in applying these exemptions, courts would reconcile these competing interests by balancing all while ignoring none. It is not, Congress noted,

> an easy task to balance the opposing interests, but it is not an impossible one either.... Success lies in providing a workable formula which encompasses, balances, and protects all interests, yet places emphasis on the fullest responsible disclosure.

S.Rep. No. 813 at 3 (quoted in *EPA v. Mink*, 410 U.S. 73, 80, 93 S.Ct. 827, 832–33, 35 L.Ed.2d 119 (1973)). If more proof of this fact is needed, an explicit statutory warrant to engage in such guided balancing can be found in the language of the exemptions.[3]

Reviewing courts have decided FOIA cases using precisely the sort of structured balancing test contemplated by Congress. *See Department of Justice v. Reporters Committee for the Freedom of the Press,* — U.S. —, 109 S.Ct. 1468, 1476, 103 L.Ed.2d 774 (1989); *Rose,* 425 U.S. at 370–73, 96 S.Ct. at 1603–05; *Senate of Puerto Rico v. Department of Justice,* 823 F.2d 574, 587 (D.C.Cir.1987). The first step is to identify and evaluate the specific privacy interests implicated by the information encompassed by the disclosure request. *See Reporters Committee,* 109 S.Ct. at 1476–80; *Lesar v. Department of Justice,* 636 F.2d 472, 488 (D.C.Cir.1980). Conversely, the next step is to identify and evaluate the particular public interests that may be served—or disserved—by disclosure of the information. *See Reporters Committee,* 109 S.Ct. at 1480–83. Only after first examining each interest do we perform the actual weighing of the interests for and against disclosure.

This balancing process must be guided by the nuances of the statutory text. Prior to 1986, exemption 7(C), like exemption 6, applied to disclosures that "would constitute" an invasion of privacy. In 1986, Congress amended exemption 7(C), substituting for the phrase "would constitute" the phrase "could reasonably be expected to constitute." In the Court's view, the amendment

> represents a considered congressional effort 'to ease considerably a Federal law enforcement agency's burden in invoking [Exemption 7]'.... [I]n determining the impact on personal privacy from disclosure of law enforcement records or information, the stricter standard of whether such disclosure 'would' constitute an unwarranted invasion of such privacy gives way to the more flexible standard of whether such disclosure 'could reasonably be expected to' constitute such an invasion.

*Reporters Committee, id.* at 1473 n. 9 (quoting 132 Cong.Rec. S16504 (Oct. 15, 1986) (statement of Sen. Hatch)).

There is another crucial difference between the language in exemptions 6 and 7(C) that guides our application of the exemption 7(C) balancing test. Unlike exemption 6, which requires that an invasion of privacy be "clearly unwarranted" before nondisclosure is authorized, exemption 7(C) omits the adverb "clearly," requiring only that the invasion of privacy be "unwarranted." This omission, the product of explicit bargaining between the President and Congress, has been interpreted to mean that Congress intended that "the standard for evaluating a threatened invasion of privacy interests resulting from the disclosure of records compiled for law enforcement purposes" be somewhat broader than that used for exemption 6. *See Reporters Committee, id.* at 1472–73.

### B.

From the district court's opinion on summary judgment, we can discern three alternative conclusions regarding the privacy interests that would be implicated by disclosure of identifying information in the

---

**3.** Exemption 6, for example, requires a court to determine not just whether the disclosure of "personnel and medical files and similar files" would result in an invasion of privacy, but whether such invasion would be "clearly unwar-

ranted." 5 U.S.C. § 552(b)(6). Similarly, exemption 7(C) requires a potential invasion of privacy caused by the release of law enforcment records to be "unwarranted" before nondisclosure is permitted. *Id.* § 552(b)(7)(C).

transcripts. First, it concluded that the exemptions were not "applicable" because "[t]he conversations are about business activities," which we take to be a conclusion that the individuals identified in or by the transcripts have no privacy interests regarding such activities. Second, the court concluded that no invasion of privacy would occur because much of the information in controversy was already public insofar as APS, a nongovernmental entity, was involved in the investigation. Finally, the court reached the blanket conclusion that, as to the twenty-eight individuals who were identified in the transcripts only by their first names, no invasion of privacy would occur because "[f]irst names are not intimate information."

■ Because the district court based its decision not upon the unique facts of this case, but upon categorical rules regarding what does and does not constitute an invasion of privacy for FOIA purposes, we treat its conclusions as conclusions of law, and thus review them *de novo*.[4] As to each of the district court's conclusions, we disagree. Based upon past precedent and the statutory purposes underlying the FOIA, we find the privacy interests involved in this case to be substantial.

■ As an initial matter, we note that we are not required to determine with absolute certainty the effects of releasing the information in controversy. Indeed, as already noted, exemption 7(C) requires only that we find that the disclosure of the records or information "could reasonably be expected to constitute" an unwarranted invasion of privacy before nondisclosure is authorized.

Thus, courts have accepted, as valid, affidavits from government officials that identify the privacy interests at stake only in general terms, as " '[i]t is difficult if not impossible, to anticipate all respects in which disclosure might damage reputations or lead to personal embarrassment and discomfort.' " *Lesare*, 636 F.2d 472, at 488 (D.C.Cir.1980) (quoting and *affirming Lesar v. Department of Justice*, 455 F.Supp. 921, 925 (D.D.C.1978)). We thus do not require that the government detail the precise harm which disclosure would inflict upon the privacy interests of each individual; rather, it must only show that release of the information "could reasonably" result in an unwarranted invasion of privacy.

■ 'There can be no clearer example of an unwarranted invasion of privacy than to release to the public that another individual was the subject of [a criminal] investigation.' " *Senate of Puerto Rico*, 823 F.2d at 588 (quoting *Baez v. Department of Justice*, 647 F.2d 1328, 1338 (D.C.Cir.1980)). This fact has long been recognized in the FOIA context, and has often served as the basis for excepting information from disclosure under exemption 7(C).[5] Thus, as to the three unindicted suspects of the investigation—and other Santa Fe employees who, although not technically considered "suspects," may have been objects of investigative concern—we conclude that the privacy interests working against disclosure are substantial.

Similarly, courts have recognized that persons who are not the subjects of the investigation may nonetheless have their privacy invaded by having their identities and information about them revealed in

---

4. *See, e.g., International Brotherhood of Electrical Workers, Local 41 v. Department of Housing & Urban Dev.*, 763 F.2d 435 (D.C.Cir.1985) (review had to ensure that the district court did not "misapprehend the law"); *Mead Data Central, Inc. v. Department of the Air Force*, 566 F.2d 242, 251 n. 13 (D.C.Cir.1977) (district court's balancing under exemption 5 will not be reversed unless based upon, *inter alia*, "an error of law").

5. *See Fund for Constitutional Gov't v. National Archives & Records Serv.*, 656 F.2d 856, 865 (D.C.Cir.1981) (disclosure that a person was the unindicted subject of a criminal investigation

represents a "severe" intrusion of privacy that can be justified only when "exceptional interests militate in favor of disclosure"). *See also Carter v. Department of Commerce*, 830 F.2d 388, 391 (D.C.Cir.1987); *Antonelli v. FBI*, 721 F.2d 615, 618 (7th Cir.1983), *cert. denied*, 467 U.S. 1210, 104 S.Ct. 2399, 81 L.Ed.2d 355 (1984); *Bast v. Department of Justice*, 665 F.2d 1251, 1255 (D.C. Cir.1981) (Clark, J., sitting by designation) (documents that "carr[y] the imprimatur of an official investigation ... threaten[ ] much greater damage to an individual's reputation than newspaper articles or editorial columns").

connection with the investigation. "Exemption 7(C) is intended to protect the privacy of any person mentioned in the requested files, not only the person who is the object of the investigation." *McCorstin v. Department of Labor*, 630 F.2d 242, 245 (5th Cir.1980), *cert. denied*, 450 U.S. 999, 101 S.Ct. 1705, 68 L.Ed.2d 201 (1981).

In this case, many of the nonsuspects who are identified or referred to in the transcripts have discernible privacy interests in not having their thoughts, comments, and views regarding their work, their job performance, and their co-workers, clients, and friends released to the public. Moreover, merely being associated with a criminal investigation may lead to further embarrassment and difficulties.[6] The affidavits from two VA officials explaining their refusal to release the redacted names and identifying information cite, for each individual, precisely these concerns; again, we conclude that the district court's refusal to acknowledge that there are any privacy interests threatened by disclosure constitutes legal error.

█ We thus reject as overbroad the district court's declaration that there were no privacy interests implicated by the transcripts because the participants discussed only "business activities." The extent of one's privacy cannot be determined merely by making an isolated assessment of the subject nature of the information; thus, for

example, it is incorrect to cabin the concept of "privacy" by restricting a person's right to invoke it to only the personal or intimate details of his or her life.[7] In *Reporters Committee*, the Supreme Court used the following broad definition of "privacy" for the purposes of the FOIA:

[I]nformation may be classified as 'private' if it is 'intended for or restricted to the use of a particular person or groups or class of persons: not freely available to the public.'

109 S.Ct. at 1476 (quoting *Webster's Third New International Dictionary* 1804 (1976)) (footnote omitted). Our analysis is thus based not solely upon the subject matter of the information, but also upon the manner in which the information relating to the individuals was obtained and whether they have a reasonable interest in preventing its public disclosure.

█ We similarly reject as overly simplistic the district court's conclusion that the release of the first names of twenty-eight individuals would not implicate any privacy interests because first names are not "intimate" information. In both FOIA and other contexts involving privacy concerns, it has long been the rule that our concern is not with the identifying information *per se*, but with the connection between such information and some other detail—a statement, an event, or otherwise—which the individual would not wish to be publicly disclosed.[8]

**6.** *See Cleary v. FBI*, 811 F.2d 421, 424 (8th Cir. 1987) (recognizing privacy interests in avoiding "unnecessary questioning concerning the investigation [and] subpoenas issued by private litigants in civil suits incidentally related to the investigation," although conceding that these privacy interests may be overborne by greater public interests); *Miller v. Bell*, 661 F.2d 623, 628 (7th Cir.1981), *cert. denied*, 456 U.S. 960, 102 S.Ct. 2035, 72 L.Ed.2d 484 (1982). *Cf. Kuehnert v. FBI*, 620 F.2d 662, 667 (8th Cir.1980) (holding that, under exemption 7(C), FBI could delete the names of, and information concerning, third parties mentioned in law enforcement records, including two individuals who were not "of investigative interest" to the FBI).

**7.** *See Department of State v. Washington Post Co.*, 456 U.S. 595, 601, 102 S.Ct. 1957, 1961, 72 L.Ed.2d 358 (1982) (in reference to the stricter requirements of exemption 6, explaining that "[u]nder the plain language of the exemption,

*nonintimate* information about a particular individual which happens to be contained in a personnel or medical file can be withheld if its release would constitute a clearly unwarranted invasion of personal privacy" (emphasis added)).

**8.** *See, e.g., Harbolt v. Department of State*, 616 F.2d 772, 774 (5th Cir.) ("Nothing could be more personal than an individual's name and home address, when linked with the stigma of incarceration abroad."), *cert. denied*, 449 U.S. 856, 101 S.Ct. 154, 66 L.Ed.2d 71 (1980); *Ross v. Midwest Communications, Inc.*, 870 F.2d 271, 275 (5th Cir.1989) (state law invasion-of-privacy claim brought by a rape victim identified *only by her first name* in a television documentary must be evaluated by considering, not the publication of the victim's identity *per se*, but her identity in connection with her status as a rape victim).

■ Finally, the district court reasoned that because APS, a nongovernmental entity, had participated in the investigation, no invasion of privacy could occur because the information was already "known to the public." There are two flaws in the court's reasoning. First, there is no support in the record for the proposition that APS's knowledge is sufficient to, as it were, "fill in the blanks" in the transcripts such that it can attribute all of the references and comments in the transcripts to specific individuals. Undoubtedly, to the extent that APS employees actually participated in some of the conversations, they may have some memory of with whom they were talking and the topics discussed, although the conversations took place over five years ago. That fact, however, does not destroy any specific individual's privacy interest in having specific comments unambiguously attributed to them by government-released records.

Second, that otherwise-private information may have been at one time or in some way in the "public" domain does not mean that a person irretrievably loses his or her privacy interests in it. In *Reporters Committee*, a case decided after the district court rendered its decision in this case, the Court held that individuals retained privacy interests in "rap sheets"—files collating a person's criminal history—maintained by the FBI, despite the fact that all of the information contained in the files was gleaned from public records scattered throughout the country. The Court's reasoning is instructive here:

> In an organized society, there are few facts that are not at one time or another divulged to another. Thus the extent of the protection accorded a privacy right at common law rested in part on the degree of dissemination of the allegedly private

fact and the extent to which the passage of time rendered it private....

.    .    .    .    .

In addition to the common-law and dictionary understanding, the basic difference between scattered bits of criminal history and a federal compilation, federal statutory provisions, and state policies, our cases have also recognized the privacy interest inherent in the nondisclosure of certain information even where the information may have been at one time public....

109 S.Ct. at 1476–78.[9]

It was thus incorrect for the district court to conclude categorically that the individuals identified in the transcripts lost all privacy interests in the information relating to them in the transcripts merely because some other individuals may have knowledge of the conversations. To the contrary, our discussion, *supra*, of these privacy interests indicates that the identified individuals still retain substantial interests in preventing the further dissemination of the information.[10]

Admittedly, without knowing in detail the particular facts of each individual's life and relationships with employers, clients, and co-workers, it is difficult to conclude that the privacy interests of those persons mentioned only in passing are without doubt substantial, such that they may be overcome by only the greatest public interests. It must be remembered, however, that we have as of yet looked at only one side of the scale; even a small and potentially uncertain invasion of privacy engendered by the release of identifying information may nonetheless be "unwarranted" if there are no public interests supporting disclosure of the particular information. It is thus to the other side of the scale that we now turn.

**9.** The Court concluded its analysis with this broad statement: "In sum, the fact that 'an event is not wholly "private" does not mean that an individual has no interest in limiting disclosure or dissemination of the information.'" 109 S.Ct. at 1478 (quoting Rehnquist, Is an Expanded Right of Privacy Consistent with Fair and Effective Law Enforcement?, Nelson Timothy Stephens Lectures, Univ. of Kan. Law School, pt. 1, at 13 (Sept. 26–27, 1974)).

**10.** *Cf. Bast*, 665 F.2d at 1251 ("[P]ublicity in the popular media cannot vitiate the FOIA privacy exemption for official information [when the media publicity has consisted of little more than journalistic speculation]. Furthermore, renewed publicity brings with it a renewed invasion of privacy. The renewed intrusion is subject, in its own right, to FOIA protection.").

## C.

In its memorandum opinion, the district court identified the primary public interest supporting disclosure of the redacted information as the "compelling interest in federal contractors, irrespective of evidence of fraud." Although we agree with the court that, in general, the public does have an interest in obtaining information regarding the government's interaction with federal contractors, merely stating that the interest exists in the abstract is not enough; rather, the court should have analyzed how that interest would be served by compelling disclosure in this case. After review of the record, we conclude that this interest would be little served by compelling disclosure of the identifying information in the transcripts.

Our inquiry into whether the public interest would be served by disclosure in this case is guided by the salutary underlying rationale of the FOIA, which is "to open agency action to the light of public scrutiny." *Rose*, 425 U.S. at 372, 96 S.Ct. at 1604. In *Reporters Committee*, the Court eloquently reaffirmed this central principle:

> In our leading case on the FOIA, we declared that the Act was designed to create a broad right of access to 'official information.' *EPA v. Mink*, 410 U.S. 73, 80, 93 S.Ct. 827, 832, 35 L.Ed.2d 119 (1973). In his dissent in that case, Justice Douglas characterized the philosophy of the statute by quoting this comment by Henry Steele Commager:
>
> > ' "The generation that made the nation thought secrecy in government one of the instruments of Old World tyranny and committed itself to the principle that a democracy cannot function unless the people are permitted to know *what their government is up to.*" ' *Id.*, at 105, 93 S.Ct., at 845 (quoting

from The New York Review of Books, Oct 5, 1972, p. 7) (emphasis added). This basic policy of ' "full agency disclosure unless information is exempted under clearly delineated statutory language," ' *Department of the Air Force v. Rose*, 425 U.S., at 360–361, 96 S.Ct., at 1599 (quoting S.Rep. No. 813, 89th Cong., 1st Sess., 3 (1965)), indeed focuses on the citizens' right to be informed about 'what their government is up to.'

109 S.Ct. at 1481 (footnote omitted).

A corollary to this principle is that, because our focus must be upon whether disclosure serves the general public's interest in governmental affairs, the specific motives of the party making the FOIA request are irrelevant. If the general public has a legitimate, albeit abstract, interest in the requested information such that disclosure is warranted, disclosure must be made despite the fact that the party actually requesting and receiving the information may use it for less-than-lofty purposes.

Conversely, if disclosure of the requested information does not serve the purpose of informing the citizenry about the activities of their government, disclosure will not be warranted even though the public may nonetheless prefer, albeit for other reasons, that the information be released. *See Reporters Committee, id.* at 1480–82 ("Our previous decisions establish that whether an invasion of privacy is warranted cannot turn on the purposes for which the request for information is made.").[11] Thus, that Halloran wishes to use the transcripts in civil litigation against Santa Fe is irrelevant to our inquiry[12]; our discussion of the public interests served or disserved by disclosure must focus solely upon whether disclosure of the identifying information in the transcripts fosters the public's legitimate interest in the affairs of government.

---

**11.** This point is further illustrated by the Court's conclusion in *Reporters Committee* that disclosure of the requested rap sheets would not serve any public interest for the purposes of the FOIA: What we have said should make clear that the public interest in the release of any rap sheet on Medico that may exist is not the type of interest protected by the FOIA.... There is, unquestionably, *some* public interest in pro-

viding interested citizens with answers to their questions about Medico. But that interest falls outside the ambit of the public interest that the FOIA was intended to serve. 109 S.Ct. at 1482 (emphasis in original).

**12.** *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 143 n. 10, 95 S.Ct. 1504, 1513 n. 10, 44 L.Ed.2d 29 (1975).

Viewing the matter in this light, we cannot find any significant public interest, relevant for the purposes of the FOIA, in disclosure of the identifying information in the transcripts. Undoubtedly, the public has an interest in learning about the nature, scope, and results of the VA's investigation of, and its relationship with, one of its contractors. That interest, however, has already been substantially served by the release of the redacted transcripts and the VA's report on the investigation, from which the full nature and extent of the VA's actions, as well as whatever the VA learned from its surreptitious recording of the conversations, can be discerned. Disclosure of the identities of the individual suspects employed by Santa Fe, and the identities of others unrelated to the investigation, will add little to the public's understanding of "what [its] government is up to." [13]

We do not mean to belittle the fact that redactions—particularly of names and identifying information—may nonetheless impede knowledge and understanding of the government's actions. A review of the transcripts and the VA's report, however, leads to the inescapable conclusion that Halloran's claim that the redactions have rendered the transcripts "incomprehensible" is off the mark. For his private purposes—use of the transcripts in civil litigation between private parties—the redacted transcripts may indeed be "incomprehensible"; for the purposes of the FOIA, however, release of the redacted transcripts both adequately conveys the information in which the public has a legitimate interest and ensures that the relevant privacy interests are respected.

### III.

In sum, we hold that the privacy interests identified in the affidavits from VA officials, when balanced against the minimal public interest that would be served by disclosure, are sufficiently weighty to support the government's redactions of identifying and medical information from the transcripts. In so holding, we emphasize that we find it unnecessary to employ the sort of categorical balancing used by the Supreme Court in *Reporters Committee* to justify the nondisclosure of an entire class of documents, namely, rap sheets. *See* 109 S.Ct. at 1483–85. Rather, our holding is based upon an evaluation, in light of the underlying circumstances of the case, of the specific transcripts at issue and the affidavits submitted by the government supporting nondisclosure.

We thus REVERSE the judgment of the district court and RENDER judgment in favor of the Veterans Administration in No. 88–6180, and vacate the judgment in No. 89–2055.[14]

---

**13.** In *Miller,* the court upheld, on similar grounds, the nondisclosure of the identities of FBI agents mentioned in FBI investigation records:

[T]he substance of the information in the FBI files has been exposed in its entirety, and only the names of the FBI agents deleted.... The documents thus reveal the entire course of the investigation and the facts uncovered. This information should be sufficient to permit the plaintiff to evaluate the thoroughness of the investigation. We find any public interest in pursuing the completeness of and adequacy of the investigation beyond this point to be minimal in the extreme.

661 F.2d at 630–31. *See id.* at 631–32 (using the same analysis for third parties mentioned in the files).

**14.** *See supra* note 1.