CHIN, J.,
Dissenting. — I disagree with the majority’s conclusion that the City of Long Beach (the City) and the Long Beach Police Officers Association (the Union) have failed to show that the information Los Angeles Times Communications LLC (the Times) has requested — the names of the officers “involved in” the December 12, 2010, shooting of Douglas Zerby and the names of all police officers “involved in” shootings from January 1, 2005, until December 11, 2010 — is exempt from disclosure under the California Public Records Act (CPRA) (Gov. Code, § 6250 et seq.).[1] In my view, the evidence in the record of the safety threat faced by police officers identified as having been involved in a shooting establishes that the requested information is exempt from disclosure under section 6254, subdivision (c), which provides that the CPRA does not require disclosure of “[pjersonnel, medical, or similar files, the disclosure of which would constitute an unwarranted invasion of personal privacy.” I therefore dissent.
In relying on this section, the Union acknowledges that the majority in Commission on Peace Officer Standards & Training v. Superior Court (2007) 42 Cal.4th 278 [64 Cal.Rptr.3d 661, 165 P.3d 462] (Commission on Peace Officer Standards) held that “the privacy and safety interests of peace officers” as a group regarding the mere fact of their employment “do not outweigh the public’s interest in the disclosure of [that] information.” (Commission on Peace Officer Standards, supra, 42 Cal.4th at p. 303.) The Union argues, however, that the “heightened safety concerns of officers who have been involved in shootings” warrant striking a different “balance” with regard to this “subgroup.” In support of its argument, the Union relies on the declaration of Long Beach Police Lieutenant Lloyd Cox (Cox declaration), which states in relevant part: (1) “A number of officer involved shootings involve gang members or violent criminals”; (2) “When an officer is involved in a shooting with a gang member, it is not uncommon for the gang to retaliate against law enforcement officers”;. (3) “Since late 2007, the Long Beach Police Department has issued eight Officer Safety Bulletins to the department about potential retaliation/threats against officers, two of which were directly related to shootings involving police officers. As recently as January 10, 2011, the department was notified of graffiti at 5100 Appian Way *77 that was approximately four feet high and six inches long which read ‘Strike Kill a Cop’ and (4) “Today, in the age of the internet, knowing an individual’s name can be the gateway to a world of information. Public documents are readily accessible on line and can provide anyone with the home address of an individual, including a police officer. The address of a police officer in the hands of a gang member, violent offender, or angry friend, relative, or associate of a person who was shot by a police officer is of great concern for the personal safety of both the officer and their [sz'c] family. Therefore the Long Beach Police Department insists on protecting the identity of its officers, when those officers are involved in critical incidents, including shootings, in order to ensure their safety and the safety of their families.”
I agree with the Union’s argument. As I explained in Commission on Peace Officer Standards, “in 1990, the Legislature amended subdivision (a) of [Penal Code] section 832.8 by adding [officers’] ‘home addresses’ to the list of examples of confidential ‘[p]ersonal data.’ (Stats. 1990, ch. 264, § 1, p. 1535.) According to the amendment’s legislative history, one of the Legislature’s purposes in adding ‘home addresses’ to the list was to protect officers and their families. (Assem. Com. on Public Safety, Analysis of Sen. Bill 1985 (1989-1990 Reg. Sess.) as amended May, 16, 1990, p. 2.) Given that publicly available databases on the Internet make it easy to link a name to an address, the release of an officer’s name would not seem to pose much, if any, less of a safety risk than would disclosing an officer’s home address. (See Frank v. City of Akron (6th Cir. 2002) 290 F.3d 813, 819 [‘Most individuals’ addresses ... are readily available on the Internet’].) . . . [I]n light of the accessibility of information through the Internet, it would be entirely ‘feasible’ for someone hostile toward the police to use the list of names to locate peace officers’ addresses in order to ‘harass them’ or their families. [Citation.] Moreover, in light of the Legislature’s acknowledgment of the dangers faced by officers and their families, ... we [cannot] simply dismiss this threat as being ‘purely speculative.’ (See King County v. Sheehan [(2002) 114 Wn.App. 325, 340 [57 P.3d 307]] [it is ‘naive ... to believe that police officers who are identified on anti-police web sites ... by name and home address . . . could not thereby be placed in danger or subjected to harassment’].)” (Commission on Peace Officer Standards, supra, 42 Cal.4th at p. 317 (dis. opn. of Chin, L, fn. omitted).) The evidence in the record here amply supports this analysis.
Nothing in the majority’s brief discussion of section 6254, subdivision (c), convinces me otherwise. The majority first asserts that there is a “serious question” as “to whether the names of peace officers involved in particular law enforcement incidents can be characterized as ‘[personnel ... or similar files’ ” within the meaning of section 6254, subdivision (c). (Maj. opn., ante, at p. 73.) However, for reasons I have explained in a previous case, I have no trouble concluding that the names of officers who have been involved in a *78 shooting constitute “personnel ... or similar files” under section 6254, subdivision (c). (See International Federation of Professional & Technical Engineers, Local 21, AFL-CIO v. Superior Court (2007) 42 Cal.4th 319, 350-351 [64 Cal.Rptr.3d 693, 165 P.3d 488] (cone. & dis. opn. of Chin, J.) (International Federation).)
The majority then moves on to its primary focus: the public’s interest. Relying on Commission on Peace Officer Standards, the majority first identifies the public’s interest generally in “the conduct of its peace officers” — specifically, the “ ‘[mjisuse’ ” of their authority — and asserts that, “when it comes to the disclosure of a peace officer’s name,” this interest “outweighs, in most cases, the officer’s personal privacy interest.” (Maj. opn., ante, at pp. 73-74.) The majority next asserts that this general public interest “is particularly great” in connection with “officer-involved shootings” because “such shootings often lead to severe injury or death.” (Maj. opn., ante, at p. 74.) This heightened public interest, the majority states, “tips” the balance here “strongly in favor of identity disclosure.” (Ibid.)
The majority’s discussion is unpersuasive for several reasons. First, the majority fails to explain how disclosing the name of an officer who has in any way been “involved in officer involved shootings” — which is what the Times seeks — provides any information about whether the involved officers “ ‘[m]isuse[d]’ ” their authority. (Maj. opn., ante, at p. 74.) Thus, merely knowing which officers were “involved in officer involved shootings” does little, if anything, to advance the public’s interest in “the conduct of its peace officers.” (Maj. opn., ante, at p. 73.)
Second, the majority’s assessment of the public’s interest is inconsistent with the Legislature’s and the voters’ view of that interest. Through the Pitchess statutes (see maj. opn., ante, at pp. 67-68), the Legislature has precluded the general public from obtaining “[pjeace officer . . . personnel records” or “information obtained from these records.” (Pen. Code, § 832.7, subd. (a).) It has specified that this restriction protects records “relating to” (1) an officer’s “advancement, appraisal, or discipline” (id., § 832.8, subd. (d)), and (2) “[c]omplaints, or investigations of complaints, concerning an event or transaction in which [an officer] participated, or which he or she perceived, and pertaining to the manner in which he or she performed his or her duties” (id., § 832.8, subd. (e)). It has authorized law enforcement agencies to “disseminate data regarding the number, type, or disposition of complaints . . . made against [their] officers” only “if that information is in a form which does not identify the individuals involved.” (Id., § 832.7, subd. (c).) These provisions clearly express the Legislature’s view regarding the public’s interest in discovering whether particular officers have misused their power or even have been the subject of complaints about their conduct. *79 The voters have ratified the Legislature’s view by passing a constitutional provision that expressly preserves “statutory procedures governing discovery or disclosure of information concerning the official performance or professional qualifications of a peace officer.” (Cal. Const., art. I, § 3, subd. (b)(3).) The majority improperly ignores these expressions of policy by the Legislature and the voters, and improperly substitutes its own view of policy. As a court, we have neither prerogative nor power “to substitute our public policy judgment” for that of the Legislature and the voters. (Thomas v. City of Richmond (1995) 9 Cal.4th 1154, 1165 [40 Cal.Rptr.2d 442, 892 P.2d 1185].)
The majority errs in asserting that Penal Code section 830.10 “reflects a legislative policy that, generally, the public has a right to know the identity of an officer involved in an on-duty shooting.” (Maj. opn., ante, at p. 72.) That section provides: “Any uniformed peace officer shall wear a badge, nameplate, or other device which bears clearly on its face the identification number or name of the officer.” (Pen. Code, § 830.10.) On its face, the section applies only to “uniformed” officers. (Ibid.) Thus, to the extent it has any relevance to officers who are not in uniform, it indicates a legislative intent to protect their identities. Even as to uniformed officers, it fails to support the majority’s broad conclusion that the public, “generally,” has a right to know the identity of officers involved in shootings. (Maj. opn., ante, at p. 72.) Under the section, police departments may choose not to require their uniformed officers to display their names, and may instead require them only to display their “identification number[s].” (Pen. Code, § 830.10.) Even were the statute to require officers to display their names, a statute affording the immediate participants in a police encounter access to the officers’ names does not reflect'a far broader legislative policy that, “generally, the public has a right to know the identity of an officer involved in an on-duty shooting.” (Maj. opn., ante, at p. 72.) This conclusion is obvious from the fact that, as noted above, the Pitchess statutes allow law enforcement agencies to “disseminate data regarding the number, type, or disposition of complaints . . . made against [their] officers” only “if that information is in a form which does not identify the individuals involved.” (Pen. Code, § 832.7, subd. (c).) In other words, the Legislature has precluded release of identifying information generally to the public even though the names of officers against whom complaints have been made are known to those who have filed complaints. As the majority recognized in Commission on Peace Officer Standards, “the mere fact that officers’ names” may be displayed on their uniforms does not mean “that the information cannot be considered personal or private. (See Department of Defense v. FLRA (1994) 510 U.S. 487, 500 [127 L.Ed.2d 325, 114 S.Ct. 1006] [‘An individual’s [privacy] interest in controlling the dissemination of information regarding personal matters does not dissolve *80 simply because that information may be available to the public in some form’].)”[2] (Commission on Peace Officer Standards, supra, 42 Cal.4th at p. 296, fn. 5.)
Nor do I agree with the majority that, under section 6254, subdivision (f), “when a shooting by a peace officer occurs during an arrest [citation] or in the course of responding to a complaint or request for assistance [citation], and when the officer’s name is recorded as one of the ‘factual circumstances’ of the incident, disclosure of the officer’s name is generally required.” (Maj. opn., ante, at p. 72.) Section 6254, subdivision (f), generally exempts from disclosure under the CPRA “[r]ecords of complaints to, or investigations conducted by, . . . any state or local police agency.” As here relevant, it further provides that, “[notwithstanding any other provision of this subdivision,” a law enforcement agency “shall” disclose the following: (1) “the factual circumstances surrounding the arrest” of each person the agency arrests (§ 6254, subd. (f)(1) and (2) the “nature of the response” to all complaints or requests for assistance the agency receives, “including, to the extent the information regarding crimes alleged or committed or any other incident investigated is recorded, ... the factual circumstances surrounding the crime or incident” (id., subd. (f)(2)). Where one of the specified incidents involves a shooting, it is not at all clear that the “factual circumstances surrounding” the incident (id., subd. (f)(1), (2)) include the names of officers involved in the shooting. The majority cites, and I have found, no case supporting that view. Moreover, the language stating that these disclosure provisions apply “[notwithstanding any other provision of this subdivision” (id., subd. (f), italics added) indicates that the section’s disclosure requirement does not override the confidentiality provisions found in other statutes. Our courts of appeal have so construed the statute. (County of Los Angeles v. Superior Court (1993) 18 Cal.App.4th 588, 600 [22 Cal.Rptr.2d 409] [“we cannot construe section 6254, subdivision (f), to require” disclosure of “law enforcement information” the Pitchess statutes make confidential].) Finally, the statute itself authorizes nondisclosure “to the extent that disclosure of a particular item of information would endanger the safety of a person involved in an investigation or would endanger the successful completion of the *81 investigation or a related investigation.” (§ 6254, subd. (f).) Because, in my view, this would include the names of officers involved in shootings, I do not agree that, even under the circumstances the majority posits, section 6254, subdivision (f), “generally require[s]” disclosure of the information the Times seeks.[3] (Maj. opn., ante, at p. 72.)
The majority also makes several errors in evaluating the other side of the balance: the interests of the officers in nondisclosure. Although relying principally on a heightened public interest in officer-involved shootings, the majority fails to consider or even acknowledge the officer’s heightened privacy and safety interests in such cases. In this regard, Commission on Peace Officer Standards, on which the majority principally relies (maj. opn., ante, at pp. 72-73), actually supports the Union. There, in holding that “the typical peace officer has [no] more than an insubstantial privacy interest in the fact of his or her employment as an officer” (Commission on Peace Officer Standards, supra, 42 Cal.4th at p. 300), the majority reasoned that the fact of employment is “innocuous information” (id. at p. 302) because “it would not reveal [the officer’s] involvement in any particular case” (id. at p. 302, fn. 12, italics added). In this regard, the majority reasoned, disclosure of basic employment information is different from the disclosure sought in Stone v. F.B.I. (D.D.C. 1990) 727 F.Supp. 662 (Stone): the names of FBI agents “who participated in the investigation of the assassination of Robert F. Kennedy.” (Commission on Peace Officer Standards, supra, 42 Cal.4th at p. 302, fn. 12.) In Stone, “ ‘[w]hat could reasonably be expected to constitute an unwarranted invasion of an agent’s privacy is not that he or she is revealed as an FBI agent but that he or she is named as an FBI agent who participated in the RFK investigation.’ [Citation.]” (Commission on Peace Officer Standards, supra, at p. 302, fn. 12.) The “ ‘concern is not with the identifying information per se, but with the connection between such information and some other detail — a statement, an event, or otherwise — which the individual would not wish to be publicly disclosed.’ ” (Ibid., quoting Halloran v. Veterans Administration (5th Cir. 1989) 874 F.2d 315, 321.) Here, the information the *82 Times seeks would reveal the participation of the named officers in “particular case[s]” and would reveal their connection to an event — a shooting — they may “ ‘not wish to be publicly disclosed.’ ” (Commission on Peace Officer Standards, supra, at p. 302, fn. 12.) As the majority opinion in Commission on Peace Officer Standards establishes, the officers therefore have a heightened privacy interest in nondisclosure. Moreover, the potentially incendiary nature of the information the Times seeks — an officer’s involvement in a shooting — further heightens an officer’s already elevated privacy interest in not being linked to “particular case[s].” (Ibid.) The majority errs in failing even to acknowledge this heighted interest.
Finally, the majority’s conclusion that the Union’s claim under section 6254, subdivision (c), fails for lack of a “particularized showing” regarding the need for confidentiality (maj. opn., ante, at p. 74) is both erroneous and inconsistent with our prior decisions. The majority acknowledges both the existence and validity of the “safety concerns of officers who fear retaliation from angry members of the community after an officer-involved shooting.” (Maj. opn., ante, at p. 75.) It also acknowledges that the record contains evidence of “ ‘potential retaliation/threats ’ against officers involved in shootings.” (Maj. opn., ante, at p. 75.) However, the majority finds this evidence too “vague” and insists that more is required; as to each officer whose name is to be withheld, there must be evidence to “establish” a “specific danger” to the officer or to the members of the officer’s family. (Maj. opn., ante, at p. 74.)
The specificity of proof the majority demands is inconsistent with our decision in Times Mirror Co. v. Superior Court (1991) 53 Cal.3d 1325 [283 Cal.Rptr. 893, 813 P.2d 240] (Times Mirror). There, we held that, because of safety concerns, the Governor of California had properly refused to disclose his daily, weekly, and monthly appointment calendars and schedules. (Id. at pp. 1329, 1346-1347.) The only evidence supporting our conclusion was the declaration of the Governor’s security director, which stated in the most general terms that disclosing this information “ ‘would seriously impair [his] . . . ability to assure the Governor’s security, and would constitute a potential threat to the Governor’s safety, because the information . . . will enable the reader to know in advance and with relative precision when and where the Governor may be found, those persons who will be with him, and when he will be alone.’ ” (Id. at p. 1346, italics added.) Based on this evidence of a “ ‘potential threat to the Governor’s safety’ ” (ibid.), and without requiring evidence of a particular or “specific” threat (maj. opn., ante, at p. 75), we concluded that, even as to “outdated calendars and schedules,” nondisclosure was justified because “it is plausible to believe that an individual intent on doing harm [to the Governor] could use such information to discern activity patterns of the Governor and identify areas of particular vulnerability.” (Times Mirror, supra, at p. 1346.) Here, based on *83 the Cox declaration, it is plausible to believe there are individuals, intent on doing harm to police officers in retaliation for their involvement in a shooting, who could use the requested information to exact revenge on the officers or members of their families. The “showing” in this case regarding safety concerns is certainly no more “vague,” and is at least as, if not more, “particularized” (maj. opn., ante, at p. 74), than the showing we found sufficient in Times Mirror.[4]
The majority does not contend otherwise or explain why Times Mirror is inapplicable. Instead, in applying a different and far stricter standard, it simply ignores Times Mirror. It fails to explain why police officers and their family members are entitled to less protection than the Governor. Surely, their lives are not worth less. Nor is it less “plausible to believe” there are “individual[s] intent on doing harm” to police officers involved in shootings than it is to believe there are “individual[s] intent on doing harm” to the Governor. (Times Mirror, supra, 53 Cal.3d at p. 1346.) On the contrary, as already noted, the majority acknowledges both the existence and validity of the “safety concerns of officers who fear retaliation from angry members of the community after an officer-involved shooting.” (Maj. opn., ante, at p. 75.)
Contrary to the majority’s suggestion (maj. opn., ante, at pp. 72-74), Commission on Peace Officer Standards and International Federation are consistent with, and supportive of, this analysis. In neither case was there any evidence submitted regarding the alleged safety concerns, a circumstance the court stressed in refusing to apply a disclosure exemption. (Commission on Peace Officer Standards, supra, 42 Cal.4th at p. 302; International Federation, supra, 42 Cal.4th at pp. 337-338.) Notably, after stating that “ ‘[a] mere assertion of possible endangerment’ is insufficient to justify nondisclosure,” the majority in Commission on Peace Officer Standards cited Times Mirror as a case in which nondisclosure was justified because the evidence — the “declaration of [the] Governor’s security director” — “supported [the] conclusion that release of his schedules would present a potential security threat.” (Commission on Peace Officer Standards, supra, at p. 302.) As earlier explained, here, even more than in Times Mirror, evidence regarding the dangers of disclosure was submitted. Moreover, in Commission on Peace Officer Standards, the majority held that, on remand, nondisclosure as to officers in certain “categories” could be justified “because the safety or *84 efficacy of’ officers in those categories “would be jeopardized by disclosure.” (Commission on Peace Officer Standards, supra, 42 Cal.4th at p. 284.) The majority in Commission on Peace Officer Standards identified one such category: officers “operating undercover.” (Id. at p. 301.) The Times’s broad request for the names of all officers “involved in” shootings from January 1, 2005, until December 11, 2010, surely includes such officers. Moreover, the evidence in the record here establishes another category of officers whose safety would be jeopardized by disclosure: those who have been involved in a shooting.
Contrary to the majority’s suggestion, there is no basis for excluding from this category officers who, in using their weapons, “acted in a heroic manner that was unlikely to provoke retaliation.” (Maj. opn., ante, at p. 75.) The majority asserts that safety is not “an issue” for such officers. (Maj. opn., ante, at p. 75.) But the majority fails to explain how to distinguish between heroic acts that are likely to provoke retaliation and those that are not. And it is naive to believe that the desire for revenge of friends, family members, and gang associates of those shot by police will be reduced, much less eliminated, by the fact that the officers acted heroically. Indeed, the majority’s bald assertion will surely come as surprising news to the many officers who, having heroically used their weapons in confronting gang-related crime, face retaliation from other gang members. It simply is not true, as the majority asserts, that officer safety is “not... an issue” whenever a shooting may be characterized as “heroic” and “unlikely to provoke retaliation.” (Maj. opn., ante, at p. 75.) Of course, as to individual officers who do not perceive a safety threat to themselves or their families, and who do not oppose public recognition of their heroism, section 6254, subdivision (c), would not prevent disclosure. Releasing an officer’s name under those circumstances would not constitute “an unwarranted invasion of personal privacy.” (Ibid.)
Finally, there are good reasons for not requiring, as to each officer whose name is to be withheld, evidence of an actual and specific threat to the officer or the members of his or her family. Where, as here, the disclosure request covers all officer-involved shootings during a six-year period, requiring such individualized proof will impose an obvious and substantial burden on law enforcement agencies that want to protect their officers.[5] More importantly, as the Union observes, “killers do not usually announce their intentions in advance.” Thus, in most cases, although the threat to officer safety is real, the *85 kind of evidence the majority demands is not available. Because the lives of our officers and their families are at stake, I would not require a law enforcement agency to wait until there is a specific threat — or worse, an actual attack — before allowing it to withhold information that puts its officers and their families at risk. Absent a showing df some greater public need for the information, we should allow law enforcement agencies to protect the very officers who are out there every day protecting us. They deserve at least that much for their brave service.
I therefore dissent.[6]

 All further unlabeled statutory references are to the Government Code.

 The majority cites no legislative history to support its view of the “legislative policy” Penal Code section 830.10 “reflects.” (Maj. opn., ante, at p. 72.) The statute derives from its substantively identical predecessor, Penal Code former section 830.7, which provided: “Any uniformed peace officer shall wear a badge, nameplate, or other device which bears clearly on its face the identification number or name of such officer.” (Stats. 1969, ch. 1458, § 1, p. 2978.) In the only illuminating item of legislative history I could find — a letter to the Governor urging him to sign the passed bill containing the statute — the bill’s legislative author stated that it would “aid[] morale in that it goes far to halt the deindividualization of our law enforcement personnel.” (Assemblyman John Miller, letter to Governor Ronald Reagan regarding Assem. Bill No. 1830 (1969 Reg. Sess.) Aug. 8, 1969, p. 1.) This letter does not support the majority’s assertion.

 The majority asserts that the disclosure exemption of section 6254, subdivision (f), does not apply because the requested information comes from a source other than “the records of any administrative or criminal investigation” of officer-involved shootings (maj. opn., ante, at p. 74), perhaps “the initial incident reports” of such shootings (maj. opn., ante, at p. 71). The appellate record offers no basis for the majority’s speculation regarding the source of the requested information, as to either the Zerby shooting or any of the other officer-involved shootings that occurred during the six-year period the request identifies. Nor does the majority offer any legal basis for construing the broadly worded phrase “records relating to ... [f¡ .. . HD . . . [e]mployee . . . appraisal[] or discipline,” which defines one category of confidential personnel records under Penal Code section 832.8, subdivision (d), to apply narrowly “only” to “the records generated in connection with” officer appraisal or discipline (maj. opn., ante, at p. 71). Had the Legislature intended to so limit the scope of confidentiality under this section, it easily could have used the majority’s far narrower phrase.

 Moreover, although there is a greater showing in this case regarding safety than in Times Mirror, the showing needed to justify nondisclosure here arguably is less than the showing that was needed in Times Mirror. Nondisclosure is proper under section 6254, subdivision (c), upon a showing that disclosure “would constitute an unwarranted invasion of personal privacy.” In Times Mirror, we held that nondisclosure was proper under section 6255, which requires a showing that “on the facts of the particular case the public interest served by not disclosing the record clearly outweighs the public interest served by disclosure of the record.” (Italics added; see Times Mirror, supra, 53 Cal.3d at pp. 1346-1347.)

 For example, according to reported statistics, the Los Angeles Police Department averaged 70 officer-involved shootings per year for the years 2005-2008. (L.A. Police Dept., Use of Force Annual Report, p. 16 <http://www.lapdonline.org/assets/pdf/2009YearEndReportFinal. pdf> [as of May 29, 2014].) In 42 officer-involved shootings internally reviewed in 2009 for compliance with department policy, “[t]here were 278 substantially involved officers,” 85 of whom “discharged their firearms.” (Id. at p. 19.)

 Given my conclusion, I do not further address the majority’s analysis regarding the applicability of the exemptions set forth in Government Code section 6255 and Penal Code sections 832.7 and 832.8.