# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued April 25, 2006        Decided June 2, 2006

No. 05-5256

JUDICIAL WATCH, INC.,
APPELLANT

v.

FOOD & DRUG ADMINISTRATION, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 00cv02973)

---

*Meredith L. Di Liberto* argued the cause for appellant. With her on the briefs was *Paul J. Orfanedes*.

*Fred E. Haynes*, Assistant U.S. Attorney, argued the cause for appellees Food & Drug Administration. With him on the brief were *Kenneth L. Wainstein*, U.S. Attorney, *Michael J. Ryan*, and *Eric M. Blumberg*, Deputy Chief Counsel, Food & Drug Administration. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

*Nancy L. Buc*, *Kate C. Beardsley*, and *Carmen M. Shepard* were on the brief for appellees Population Council, Inc. and Danco Laboratories, LLC.

Before: SENTELLE, HENDERSON and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

SENTELLE, *Circuit Judge*: Judicial Watch filed an action in the District Court for the District of Columbia, seeking enforcement of its Freedom of Information Act ("FOIA") request for all documents related to the Food and Drug Administration's ("FDA") approval of the drug mifepristone. It now appeals from the District Court's grant of summary judgment in favor of the FDA. Although we affirm the District Court's decision in a number of respects, because the FDA produced an inadequately detailed *Vaughn* index, we remand for further explanation of some of the index's entries.

## I. Background

In September 2000, the FDA approved the drug mifepristone, better known as RU-486, for "medical abortion" during the first 49 days of pregnancy. Shortly thereafter, Judicial Watch submitted a FOIA request seeking all mifepristone-related documents in the FDA's possession. A few months later, having not received any documents, Judicial Watch sought to enforce its request in the District Court. The FDA requested a stay, which the District Court granted. The District Court ordered the FDA to produce all responsive documents by October 15, 2001.

After searching about 250,000 pages of information, the FDA disclosed over 9,000 relevant pages to Judicial Watch on a compact disc. It withheld over 4,000 other relevant documents in their entirety and parts of almost 2,000 more. The FDA compiled and produced a 1,500-page *Vaughn* index to summarize the withholdings. *See Vaughn v. Rosen*, 484 F.2d

820 (D.C. Cir. 1973). In addition to its *Vaughn* index, the FDA filed a supporting declaration by Andrea Masciale, who supervised the FDA's search and review of documents for Judicial Watch's FOIA request. The Masciale declaration described the types of withheld information and defended the application of FOIA Exemptions 3, 4, 5, and 6 to that information. Danco Laboratories and Population Council—mifepristone's creator and manufacturer, respectively—intervened in the suit and filed two additional affidavits. The intervenors' affidavits supported the FDA's reasons for using Exemptions 4 and 6 to withhold information submitted to it during mifepristone's approval.

The FDA moved for summary judgment. Judicial Watch opposed the motion claiming the FDA performed an inadequate search, filed an inadequately detailed *Vaughn* index, and invoked several FOIA exemptions improperly. The District Court granted summary judgment for the FDA as to all matters. Judicial Watch now appeals the District Court's judgment as to the adequacy of the FDA's *Vaughn* index and the exemptions. We review de novo the District Court's grant of summary judgment. *Chappell-Johnson v. Powell*, 440 F.3d 484, 487 (D.C. Cir. 2006).

## II. Adequacy of the *Vaughn* Index

Judicial Watch primarily argues that the FDA has produced an inadequately detailed *Vaughn* index. In this section, we consider—and reject—the challenge in its broadest sense, as a facial attack on the structure of the *Vaughn* index. Although we find nothing structurally wrong with the FDA's submission, we find merit in the narrower part of Judicial Watch's adequacy argument, specifically that the FDA has vaguely described some individual documents. We defer discussion of the vagueness inquiries until Section III and its subsections dealing with each

individual FOIA exemption at issue.

We also note at the outset that at oral argument Judicial Watch appeared to concede the untenable position of its challenge to the adequacy of detail regarding documents only partially withheld. The FDA argued—and we agree—that the released portion of each document satisfied its *Vaughn* burden by supplementing the corresponding *Vaughn* index entries. The released content of the documents served to illuminate the nature of the redacted material, often limited to names or addresses. Therefore, we find that the *Vaughn* index adequately described the partially withheld documents. As with the vagueness questions, we reserve until Section III our discussion of the merits of the FDA's decision to redact certain documents.

A. *Functions of the* Vaughn *Index Requirement*

Because of its unique evidentiary configuration, the typical FOIA case "distorts the traditional adversary nature of our legal system's form of dispute resolution." *King v. U.S. Dep't of Justice*, 830 F.2d 210, 218 (D.C. Cir. 1987) (quoting *Vaughn*, 484 F.2d at 824). When a party submits a FOIA request, it faces an "asymmetrical distribution of knowledge" where the agency alone possesses, reviews, discloses, and withholds the subject matter of the request. *Id.* The agency would therefore have a nearly impregnable defensive position save for the fact that the statute places the burden "on the agency to sustain its action." 5 U.S.C. § 552(a)(4)(B); *see also Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 861 (D.C. Cir. 1980) ("[T]he burden is on [the agency] to establish [its] right to withhold information from the public.").

Possessing both the burden of proof and all the evidence, the agency has the difficult obligation to justify its actions without compromising its original withholdings by disclosing

too much information. The *Vaughn* index provides a way for the defending agency to do just that. By allowing the agency to provide descriptions of withheld documents, the index gives the court and the challenging party a measure of access without exposing the withheld information. The *Vaughn* index thereby also serves three important functions that help restore a healthy adversarial process:

> [I]t forces the government to analyze carefully any material withheld, it enables the trial court to fulfill its duty of ruling on the applicability of the exemption, and it enables the adversary system to operate by giving the requester as much information as possible, on the basis of which he can present his case to the trial court.

*Keys v. U.S. Dep't of Justice*, 830 F.2d 337, 349 (D.C. Cir. 1987) (internal quotation marks and citation omitted).

As past cases demonstrate, we focus on the functions of the *Vaughn* index, not the length of the document descriptions, as the touchstone of our analysis. *See, e.g.*, *Tax Analysts v. IRS*, 410 F.3d 715, 719-20 (D.C. Cir. 2005) (approving of *Vaughn* index with short descriptions because a combination of declarations and *in camera* review provided sufficient information for the court to review the claimed exemptions); *Coastal States Gas*, 617 F.2d at 861 (finding index with short descriptions inadequate because the supporting affidavits made "conclusory assertions of privilege"). Indeed, an agency may even submit other measures in combination with or in lieu of the index itself. *Keys*, 830 F.2d at 349 ("[I]t is the function, not the form, of the index that is important."). Among other things, the agency may submit supporting affidavits or seek *in camera* review of some or all of the documents "so long as they give the reviewing court a reasonable basis to evaluate the claim of privilege." *Gallant v. NLRB*, 26 F.3d 168, 172-73 (D.C. Cir.

1994) (internal quotation marks and citation omitted). Any measure will adequately aid a court if it "provide[s] a relatively detailed justification, specifically identif[ies] the reasons why a particular exemption is relevant and correlat[es] those claims with the particular part of a withheld document to which they apply." *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977).

B. *The Structure of the FDA's Index*

In this case, the FDA took a combined approach. In response to Judicial Watch's FOIA request, it produced a 1,500-page *Vaughn* index and supplemented the index with the supporting declaration of Andrea Masciale. The index itself includes eleven categories, consisting of the following: (1) an index identification number; (2) the document's subject; (3) its date; (4) the author; (5) the recipient; (6) the total number of pages; (7) a category entitled "Attach Page"; (8) the disposition (that is, whether entirely or partially withheld); (9) the reason for being withheld; (10) the statutory authority for the withholding; and (11) the number of pages containing withheld information. Whereas the index takes a document-specific approach, the Masciale declaration steps through the claimed exemptions. It avoids discussion of individual documents, instead describing the kinds of information withheld and how they relate to the exemptions. The intervenors filed two additional affidavits. Each covers issues specific to the documents submitted to the FDA during mifepristone's approval process, including matters ranging from competition in the abortion market to confidentiality issues.

Judicial Watch argues that the FDA's index/affidavit combination fails because it does not treat each document individually. Context dictates our approach to the particularity required of agencies. An agency may not claim exemptions too

broadly, thereby sweeping unprotected information within the statute's reach. *Mays v. DEA*, 234 F.3d 1324, 1328 (D.C. Cir. 2000) (rejecting withholding of all documents containing "investigative details" because Exemption 7 does not automatically protect such details). Broad, sweeping claims of privilege without reference to the withheld documents would impede judicial review and undermine the functions served by the *Vaughn* index requirement. The agency must therefore explain why the exemption applies to the document or type of document withheld and may not ignore the contents of the withheld documents. *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 30-31 (D.C. Cir. 1998) (disapproving submission that had no "language suggesting that the [agency] tailored its response to a specific set of documents").

On the other hand, abstraction can aid court review when drawing from specific examples. We have never required repetitive, detailed explanations for each piece of withheld information—that is, codes and categories may be sufficiently particularized to carry the agency's burden of proof. *See Keys*, 830 F.2d at 349-50. Especially where the agency has disclosed and withheld a large number of documents, categorization and repetition provide efficient vehicles by which a court can review withholdings that implicate the same exemption for similar reasons. In such cases, particularity may actually impede court review and undermine the functions served by a *Vaughn* index.

Seizing on the distinction between these two approaches, Judicial Watch asserts that the FDA claimed exemptions only in sweeping and conclusory generalities. We disagree. The FDA explained itself through *commonalities*, not *generalities*. Unsurprisingly, among thousands of withheld documents, certain topics and exemptions arose on multiple occasions. The index tied each individual document to one or more exemptions, and the Masciale declaration linked the substance of each

exemption to the documents' common elements. No rule of law precludes the FDA from treating common documents commonly. The FDA's index/affidavit combination does not resemble the general assertions of privilege that we have rejected in the past.

And we do not fault the FDA for using the language of the statute as part of its explanation for withholding documents. As long as it links the statutory language to the withheld documents, the agency may even "parrot[]" the language of the statute. *Landmark Legal Found. v. IRS*, 267 F.3d 1132, 1138 (D.C. Cir. 2001). There are only so many ways the FDA could have claimed Exemptions 4, 5, and 6 for the thousands of documents generated during mifepristone's approval. *See id.* ("It is not the agency's fault that thousands of documents belonged in the same category, thus leading to exhaustive repetition."). Again, our focus is on the functions served by the *Vaughn* index: to organize the withheld documents in a way that facilitates litigant challenges and court review of the agency's withholdings. *See Keys*, 830 F.2d at 349. The FDA's decision to tie each document to one or more claimed exemptions in its index and then summarize the commonalities of the documents in a supporting affidavit is a legitimate way of serving those functions.

### III. The Claimed Exemptions: Vagueness and Merits Challenges

Our holding that the FDA produced a structurally sound *Vaughn* index does not address the entirety of Judicial Watch's challenge to the adequacy of the index. Judicial Watch also argues that many of the index's document descriptions are indecipherable or lack information relevant to its merits claim. It further challenges the merits of the FDA's use of Exemptions 4, 5, and 6. Judicial Watch does not challenge the FDA's

withholdings pursuant to FOIA Exemption 3. 5 U.S.C. § 552(b)(3).

A. *Exemption 4*

Exemption 4 allows agencies to withhold documents containing matters that are "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). Unlike many other types of information subject to an agency's control, materials implicating Exemption 4 are generally not developed within the agency. Instead, it must procure commercial information from third parties, either by requirement or by request. The agency thus has an incentive to be a good steward of that information: Disclosure could result in competitive disadvantages to the submitting entity, discouraging them from giving quality information in the future. *Critical Mass Energy Project v. NRC*, 975 F.2d 871, 877-78 (D.C. Cir. 1992) (quoting *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 766-70 (D.C. Cir. 1974)). The agency may therefore withhold involuntarily submitted information as confidential if disclosure would (1) impair the agency's ability to get information in the future or (2) cause substantial competitive harm to the entity that submitted the information. *Id.* at 878 (citing *Nat'l Parks*, 498 F.2d at 770).[1]

The same incentive applies to the FDA approval process. The FDA requires applying companies to submit volumes of information related to a drug's development, composition,

---

[1]The District Court and intervenors suggest that at least some of the information at issue was submitted voluntarily, making it subject to the more expansive withholding standard applicable to such information. *See Critical Mass*, 975 F.2d at 878-79, 880. We need not resolve that issue at this point.

safety, and manufacture. 21 U.S.C. § 355(b)(1). A company must submit this information in an Investigational New Drug application ("IND") even prior to conducting clinical trials of a drug. 21 C.F.R. pt. 312. All the information from the IND also goes into the company's New Drug Application ("NDA"), the formal application for sale and marketing approval from the FDA. 21 C.F.R. pt. 314. Each stage of the FDA's administrative processes therefore depends directly on submissions from outside the agency.

The submission-dependent nature of the approval process means Exemption 4 extends to at least some information contained in INDs and NDAs. If it did not, other companies "could make use of the information in the INDs in order to eliminate much of the time and effort that would otherwise be required to bring to market a product competitive with the product for which" the submitting company filed the IND. *Pub. Citizen Health Research Group v. FDA*, 185 F.3d 898, 905 (D.C. Cir. 1999). Similarly, "[i]f a manufacturer's competitor could obtain all the data in the manufacturer's NDA, it could utilize them in its own NDA without incurring the time, labor, risk, and expense involved in developing them independently." *Webb v. HHS*, 696 F.2d 101, 103 (D.C. Cir. 1982). Applicants spend a great deal of resources to obtain data for an IND or NDA, and the FDA could not expect full and frank disclosure if it later released such proprietary information into the public domain.

Exemption 4 does not categorically exempt all information in INDs and NDAs, however, and the FOIA requester must have adequate descriptions in order to distinguish between protected and unprotected information. *See Pub. Citizen*, 185 F.3d at 906. Judicial Watch argues that the index contains many entries—such as document 3021 ("study 88/739/cn") and document 3023 ("study f/85/486/40")—with descriptions too

vague to allow it to mount a merits challenge to the FDA's Exemption 4 claims. Its brief is littered with other entries of which it can make neither heads nor tails, including Documents 1787 and 1788 ("table - main lab temp") and Document 3331 ("references 89/11450gn").

The FDA argues that each index entry must be considered in relation to surrounding entries and to the additional information listed in the index. Specifically, the FDA contends that the index clearly relates Document 3331 ("references 89/11450gn") with Document 3325 ("preclinical expert evaluation of ru38 486 - cover pages - 89/11450gn") and several other nearby documents, including Document 3326 ("table of contents 89/11450gn"). We agree that Document 3325 gives enough description to explain the contents—that is, a preclinical expert evaluation—of all 89/11450gn-related documents.

Other entries defy the FDA's claim of definition by association, though. For example, Documents 1787 and 1788 ("table - main lab temp") appear to be freestanding documents. In its brief, the FDA asserts that the description makes "apparent that these records were collected during an FDA inspection of a drug manufacturing facility." We disagree. In no way do these subject headings, or any other index information, connect these documents to an FDA inspection or to any particular manufacturing facility. Neither does the Masciale declaration. Although it lists "information relating to the manufacturing process" as one type of information redacted under Exemption 4, it never explains that these documents fall into that category.

The same problems infect additional entries. For instance, the FDA labeled Document 2567 as "report re: protocols ch/88/486/26, ffr/88/486/03." Surrounding entries look similar, albeit with different reference numbers, and each refers to a document of several hundred pages. In its brief, the FDA

characterizes two similar entries—Documents 3021 ("study 88/739/cn") and 3023 ("study f/85/486/40")—as "reference identification numbers" for "clinical or preclinical studies relating to the drug mifepristone." The agency added that it withheld the study titles themselves because they "constituted confidential commercial information relating to unapproved uses." Presumably, the same holds true for Document 2567, but we cannot tell without the FDA's further explanation. The document descriptions themselves shed little light individually, and surrounding entries do not help.

Documents 1902 through 1924 ("subject records") also raise questions. At oral argument, the FDA's counsel suggested that these entries may describe personal records of test subjects, which would explain the agency's reliance on Exemption 6 and personal privacy in addition to Exemption 4. Outside of counsel's post hoc explanation, though, the entries remain sufficiently ambiguous to warrant further inquiry. Where the document description only vaguely indicates the information contained therein, the use of multiple exemptions for some documents adds to the confusion about which withheld information fits with which exemption.

The FDA asserts that its affidavit, along with those of the intervenors, makes up for any deficiency in its document descriptions. We agree that the three affidavits do a number of positive things. They show that the documents containing information from INDs or NDAs likely include either trade secrets or commercial information that would be valuable to competitors. They provide evidence, sufficient to satisfy the requirements of Exemption 4, of competitive harm in the medical abortion market that would result from the release of information in the IND. Finally, they also provide sufficient evidence to satisfy Exemption 4 of actual competition in markets for nonapproved uses of mifepristone, including cancer

treatment. However persuasive, though, each of these points goes to the merits and does little to flesh out the vague document descriptions. Proving the merits of the exemption does no good if the court cannot tie the affidavits to the documents.

It is no surprise that the FDA labeled many index entries with scientific codes, lab jargon, or other identifications specific to the agency. But the FDA may not create its own cryptolect, unknown to the challenger and the court. Without a glossary or technical dictionary, any lay person would be hard pressed to understand the series of numbers and letters given as descriptions in this index. Although the FDA's brief gives additional explanation for the examples raised by Judicial Watch, countless others in the 1,500-page index remain impenetrable for persons outside the FDA.

By using this shorthand, the FDA missed sight of the *Vaughn* index's purpose—to enable the court and the opposing party to understand the withheld information in order to address the merits of the claimed exemptions. Scientific lingo and administrative slang, when unfamiliar, often baffle the brightest among us. To prevent confusion and aid resolution of this case, the FDA should have endeavored to make its technical world appear a little less foreign—and its shorthand a little less short—to Judicial Watch and the court. This is not to say that the FDA could not demonstrate that it properly claimed Exemption 4 as to these documents. Rather, the FDA "has failed to supply us with even the minimal information necessary to make a determination." *Coastal States Gas*, 617 F.2d at 861. We accordingly remand the case for further explanation of these technical descriptions.

Judicial Watch also challenges the FDA's decision to withhold the names and addresses of Population Council's business partners under Exemption 4. We decline to address the

challenge because, as discussed below, we hold that the FDA properly claimed Exemption 6 for the same information.

B. *Exemption 5*

Exemption 5 permits agencies to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Such "memorandums or letters" include those protected by the attorney–client privilege and the deliberative process privilege. *Coastal States Gas*, 617 F.2d at 862. The FDA relied on both privileges but has since released all documents initially withheld under the attorney–client privilege. Accordingly, we only address the question of deliberative process privilege, which Judicial Watch challenges on both adequacy grounds and the merits.

The deliberative process privilege protects agency documents that are both predecisional and deliberative. *Id.* at 866. We deem a document predecisional if "it was generated before the adoption of an agency policy" and deliberative if "it reflects the give-and-take of the consultative process." *Id.* (emphasis omitted). Judicial Watch contends that the FDA has not demonstrated the predecisional nature of documents without dates or with dates coming after the agency approved mifepristone. The entries without dates, it argues, can never prove that a document came before the agency's decision at issue. The entries with later dates, it contends, are by definition postdecisional.

Because we have previously approved the application of the deliberative process privilege for an "undated note," we cannot adopt Judicial Watch's proposed categorical rule on undated entries. *Krikorian v. Dep't of State*, 984 F.2d 461, 466 (D.C. Cir. 1993). Dates are but one way to illustrate a chronology, and

the FDA may have other ways to prove that the undated documents were indeed predecisional. As an example, the FDA asserts that Documents 1645 and 1646, though undated, are predecisional because they concern mifepristone's IND, filed far in advance of the NDA and the FDA's subsequent approval of the NDA. Other undated documents in the index do not have the benefit of the FDA's explanation, though. We therefore remand so that the FDA may provide more information, including dates for documents that lack them or explanations where dates cannot be found.

Likewise, documents dated after mifepristone's approval for abortion may still be predecisional and deliberative with respect to other, nonfinal agency policies, including uses of the drug that the agency has not approved. A contrary rule would undermine the privilege's purpose to encourage "honest and frank communication within the agency" without fear of public disclosure. *Coastal States Gas*, 617 F.2d at 866; *see also Mead Data Cent.*, 566 F.2d at 256 ("[T]he quality of administrative decision-making would be seriously undermined if agencies were forced to 'operate in a fishbowl' because the full and frank exchange of ideas on legal or policy matters would be impossible."). The intervenors' affidavits affirm that the companies continue to pursue other avenues of medical uses for the drug and may later seek FDA approval, which would require further final action by the agency.

The FDA admits, though, that some of the postdated documents have nothing to do with unapproved uses but instead relate to other administrative decisions, including replies to correspondence. The FDA's failure to provide an adequate explanation prevents us from determining whether every piece of correspondence *after a policy is decided* constitutes a new final agency action of its own. It may be that reflections on an already-decided policy are neither predecisional nor indicative

of the deliberative process of the government. After all, "Exemption five is intended to protect the deliberative process of government and not just deliberative material." *Mead Data Cent.*, 566 F.2d at 256 (citation omitted). On remand, the FDA must provide additional information regarding these postdated documents and the agency policies they predate and deliberate over.

Judicial Watch also challenges many Exemption 5 entries as vague, including the FDA's use of otherwise commonly understood words and phrases that it claims shed no light on the documents. For example, Judicial Watch highlights such nontechnical entries as Document 662 ("draft internal q&a"), Document 2377 ("fda form w/attach"), and Document 3222 ("fax re: listing w/attach"). The FDA counters that anyone can understand these descriptions, including "q&a," the common shorthand for "questions and answers." Furthermore, the agency argues that many entries labeled "draft" that were transmitted between FDA employees clearly implicate the "deliberative process privilege" by their very nature.

We conclude, however, that these entries suffer from vagueness defects different in kind than those discussed in the section on Exemption 4. These descriptions pose no problems of technical knowledge, but neither do they describe the withheld information. The word "fax," though commonly understood, tells the court little about the deliberative nature of the information contained in the document in question. Likewise, the term "q&a" says nothing about the information conveyed in the questions and answers.

Certainly, the label "draft" goes to the merits of Exemption 5's predecisional and deliberative elements, and the court may take notice that a document passed between two FDA employees and had a date prior to the FDA's approval of mifepristone.

*Coastal States Gas*, 617 F.2d at 866 (stating Exemption 5 protects "draft documents"). The FDA did not label all Exemption 5 entries as drafts, however, and we must bear in mind "the strong policy of the FOIA that the public is entitled to know what its government is doing and why." *Id.* at 868. Terms like "fax" and "q&a" standing alone give the court no way to determine whether the withheld information is of a deliberative nature. Accordingly, on remand the FDA must provide more informative descriptions of these commonly understood documents in addition to the less understood coding of many Exemption 4 entries.

C. *Exemption 6*

Finally, Exemption 6 allows agencies to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Citing Exemption 6 for many partially withheld documents, the FDA redacted the names of agency personnel and private individuals and companies who worked on the approval of mifepristone. In addition, it redacted the street addresses of the intervenors and all business partners associated with the manufacturing of the drug. Judicial Watch argues that the FDA cannot claim this exemption for these names and addresses because they are not in files "about an individual." The case law, however, does not support Judicial Watch's crabbed reading of the statute.

The Supreme Court has read Exemption 6 broadly, concluding the propriety of an agency's decision to withhold information does not "turn upon the label of the file which contains the damaging information." *U.S. Dep't of State v. Washington Post Co.*, 456 U.S. 595, 601 (1982). We have also read the statute to exempt not just files, but also bits of personal

information, such as names and addresses, the release of which would "create[] a palpable threat to privacy." *Carter v. U.S. Dep't of Commerce*, 830 F.2d 388, 391 (D.C. Cir. 1987). The statute does not categorically exempt individuals' identities, though, because the "privacy interest at stake may vary depending on the context in which it is asserted." *Armstrong v. Executive Office of the President*, 97 F.3d 575, 582 (D.C. Cir. 1996). Therefore, to determine whether the FDA appropriately withheld these names and addresses, "we must balance the private interest involved (namely, 'the individual's right of privacy') against the public interest (namely, 'the basic purpose of the Freedom of Information Act,' which is 'to open agency action to the light of public scrutiny')." *Horowitz v. Peace Corps*, 428 F.3d 271, 278 (D.C. Cir. 2005), *cert. denied*, 126 S. Ct. 1627 (2006) (citation omitted).

As its privacy interest, the FDA cited the danger of abortion-related violence to those who developed mifepristone, worked on its FDA approval, and continue to manufacture the drug. The supporting affidavits detail evidence of abortion clinic bombings. They also describe websites that encourage readers to look for mifepristone's manufacturing locations and then kill or kidnap employees once found. Based on these declarations, the FDA fairly asserted abortion-related violence as a privacy interest for both the names and addresses of persons and businesses associated with mifepristone. The privacy interest extends to all such employees, and the FDA need not "justify the withholding of [names] on an individual-by-individual basis under FOIA Exemption 6." *Gallant*, 26 F.3d at 173.

This asserted privacy interest must be weighed against whatever public interest exists in having the names and addresses disclosed. The FDA starts from a strong position. We have previously held that individuals have a "privacy interest in

the nondisclosure of their names and addresses in connection with financial information," surely a weaker interest than avoiding physical danger. *Lepelletier v. FDIC*, 164 F.3d 37, 47 (D.C. Cir. 1999). The opposing public interest in knowing these names and addresses is not immediately apparent, though. Judicial Watch argues that the public needs the information because mifepristone may pose dangerous health risks to women who use it. The argument is a non sequitur: Even if mifepristone has significant health risks, these names and addresses prove nothing about the nature or even the existence of the risks. In the absence of a legitimate public interest, the private interest in avoiding harassment or violence tilts the scales. Accordingly, the FDA has properly used Exemption 6 "to protect [those associated with mifepristone] from the injury and embarrassment that can result from the unnecessary disclosure of personal information." *Washington Post*, 456 U.S. at 599.

## IV. Conclusion

The FDA argues that it could have short-circuited many of Judicial Watch's claims by producing a summary index or taking a categorical approach instead of producing a full index. But the fact that the agency might have gone down a different route does not mean it can produce an inadequate submission of another variety. On remand, though, we do not expect the FDA to engage in a full reappraisal of its index. As we held above, the defects in the index are specific to the descriptions and not structural. The FDA can clarify many vague document descriptions by producing a technical lexicon for the benefit of Judicial Watch and the District Court. As always, the goal should be to allow the court to understand the withheld information to the extent necessary to address the merits. With these considerations in mind, we remand for further explanation of the entries in the *Vaughn* index for documents withheld, in

their entirety, under Exemptions 4 and 5. We affirm the District Court's grant of summary judgment in all other respects, including as to the information withheld under Exemption 6.

*So ordered*.