# United States Court of Appeals
## for the Fifth Circuit

---

No. 24-50189

---

United States Court of Appeals
Fifth Circuit

**FILED**

May 5, 2025

Lyle W. Cayce
Clerk

Texas Public Policy Foundation,

*Plaintiff—Appellant*,

*versus*

United States Department of State,

*Defendant—Appellee*.

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:22-CV-1208

---

Before Haynes, Duncan, and Wilson, *Circuit Judges*.

Cory T. Wilson, *Circuit Judge*:

The Paris Agreement is an international accord that requires participating developed nations to commit to ambitious targets for the reduction of greenhouse gas emissions. The United States joined the Agreement in 2016 under President Obama, withdrew from it in 2020 under President Trump, and rejoined it in 2021 under President Biden. That year, with input from the State Department, the Biden administration set a target of "a 50–52 percent reduction from 2005 levels in economy-wide net greenhouse gas pollution" by 2030. Though President Trump initiated

No. 24-50189

another withdrawal from the accord when he returned to office in January 2025, this case centers on how the 2030 target was set—and who set it.

## I.

"The Paris Agreement is an international compact by which participating countries have agreed to combat climate change." *Pruitt v. Biden*, No. 22-40625, 2023 WL 1299243, at *1 (5th Cir. Jan. 31, 2023). Under the Agreement, each participating country "shall prepare, communicate and maintain successive nationally determined contributions" that "reflect its highest possible ambition," while developed nations "should . . . tak[e] the lead by undertaking economy-wide absolute emission reduction targets."[1] The United States joined the Paris Agreement in 2016 under President Obama.[2] The next year, President Trump announced his intent to withdraw the nation from the Agreement, citing his concern that remaining a party to it would result in "lost jobs, lower wages, shuttered factories, and vastly diminished economic production."[3] That withdrawal took effect in 2020.[4] Two months later, "on his first day in office, President Biden signed the instrument to bring the United States back into the Paris Agreement."[5] On January 20, 2025, his first day back in office, President Trump directed the

---

[1] *Paris Agreement*, United Nations Framework Convention on Climate Change (Dec. 12, 2015), https://perma.cc/4J22-2GMV.

[2] *President Obama: The United States Formally Enters the Paris Agreement*, The White House (Sep. 3, 2016, 10:41 AM), https://perma.cc/H6XC-6DV7.

[3] *Statement by President Trump on the Paris Climate Accord*, The White House (Jun. 1, 2017), https://perma.cc/8SL4-2MD5.

[4] *See* Michael R. Pompeo, *On the U.S. Withdrawal from the Paris Agreement*, U.S. Dep't of State (Nov. 4, 2019), https://perma.cc/YEB2-2VX9. The Agreement is structured to delay the effective date of a participating country's withdrawal.

[5] Antony J. Blinken, *The United States Officially Rejoins the Paris Agreement*, U.S. Dep't of State (Feb. 19, 2021), https://perma.cc/46WF-M4VM.

No. 24-50189

U.S. Ambassador to the United Nations "immediately" to submit "formal written notification of the United States' withdrawal from the Paris Agreement" to the U.N. Secretary-General.[6]

This case concerns the Biden administration's rejoining the Agreement in 2021. A week after taking office, President Biden ordered his administration to "begin the process of developing" the United States' 2030 emissions reduction target by obtaining "analysis and input from relevant executive departments and agencies" and engaging in "appropriate outreach to domestic stakeholders."[7] Three months later, President Biden announced the target: "a 50–52 percent reduction from 2005 levels in economy-wide net greenhouse gas pollution" by 2030.[8] The White House developed the target "in consultation with the Special Presidential Envoy for Climate," John Kerry. Kerry, situated within the State Department, was "charged with leading U.S. diplomacy to address the climate crisis."[9] His team was "[i]ntegrated closely with the State Department's existing expert staff and personnel."[10]

In February 2022, the Texas Public Policy Foundation (TPPF) submitted a ten-part FOIA request to the State Department, seeking "records related to the [Department's] efforts to support the . . . [n]umber

_____

[6] Exec. Order No. 14,162, 90 Fed. Reg. 8455 (Jan. 20, 2025).

[7] Exec. Order No. 14,008, 86 Fed. Reg. 7619 (Jan. 27, 2021).

[8] *FACT SHEET: President Biden Sets 2030 Greenhouse Gas Pollution Reduction Target Aimed at Creating Good-Paying Union Jobs and Securing U.S. Leadership on Clean Energy Technologies*, The White House (Apr. 22, 2021), https://perma.cc/3PKX-G59Z.

[9] *Office of the U.S. Special Presidential Envoy for Climate*, U.S. Dep't of State, https://perma.cc/CUK9-AX2A (last visited Jan. 12, 2025).

[10] *Id.*

developed for the 2030 emissions target." Through the request, TPPF sought, *inter alia*, recommendations, determinations, analyses, summaries, and documents provided or prepared by State Department employees. The request defined "employees" to include both "career staff and political appointees."

In November 2022, having received no response to its request other than an acknowledgment of receipt, TPPF sued the Department. In March 2023, after receiving the Department's initial production of responsive records, TPPF expressed concern that the Department "appear[ed] to be taking an overly aggressive approach to redactions" by redacting from disclosed emails "the names and agency email addresses of employees." The Department replied that it had not redacted "employee titles and bureaus," "email domains," or "the names of individuals vested with policy-making authority," but had "appropriately relied on [FOIA] Exemption 6 to redact the names and contact information of its ['rank-and-file'] employees." Elsewhere, the Department categorized the employees whose identities it was withholding as "career civil service employees," "mid-level foreign service officers," and "non-decision-making policy experts." Under FOIA Exemption 6, a federal agency need not disclose information contained in "personnel and medical files and *similar files* the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6) (emphasis added).

In August 2023, TPPF moved for summary judgment, arguing, *inter alia*, that the Department was wrongly withholding employee names and email addresses. The Department cross-moved for summary judgment. The district court denied TPPF's motion and granted the Department's. *Tex. Pub. Pol'y Found. v. U.S. Dep't of State*, No. 1:22-CV-1208, 2024 WL 1190752, at *7 (W.D. Tex. Jan. 23, 2024). As relevant here, the court determined that, while "[t]he information withheld does not include medical

or personnel files," it "include[s] 'similar files'" under Exemption 6 because it "relates to individuals and, as the Department explains . . . , its release could 'subject the referenced individuals to direct harassment or unsolicited attention and would shed no light on the operations and activities of the U.S. Government.'" *Id.* at \*6 (quoting the Department's *Vaughn* index[11]). The court concluded that "the Department ha[d] overcome the presumption in favor of disclosure under Exemption 6" because (1) the Department correctly determined that "public association of a specific official with comments or edits made with the expectation of anonymity could expose the individual to unwanted and detrimental attention in the conduct of their official duties," and (2) "[t]here is simply no basis . . . to conclude that disclosing the names and email addresses of lower-level agency employees would advance the knowledge" of the process whereby the Biden administration developed the 2030 emissions reduction target. *Id.* at \*7.

As both parties agree, neither the change in presidential administration nor the recently announced withdrawal from the Paris Agreement renders this case moot. TPPF persists in seeking the names and email addresses at issue, and the Department maintains that it is required to withhold them. *Cf. Bayala v. DHS*, 827 F.3d 31, 34 (D.C. Cir. 2016) ("[O]nce all the documents are released to the requesting party, there no longer is any case or controversy.").

## II.

"We review a district court's summary judgment with respect to the application of [E]xemption 6 de novo." *Sherman v. U.S. Dep't of the Army*,

---

[11] "A *Vaughn* index is a common FOIA procedural device that lists the documents responsive to the request and explains why portions have been withheld." *Cooper Cameron Corp. v. U.S. Dep't of Labor, Occupational Safety & Health Admin.*, 280 F.3d 539, 544 n.12 (5th Cir. 2002) (citing *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973)).

244 F.3d 357, 361 (5th Cir. 2001). "The agency relying on the exemption to prevent disclosure of information bears the burden of establishing that application of the exemption is appropriate." *Id.*

## III.

FOIA "was designed 'to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.'" *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)). Under FOIA, a federal agency "shall make [requested] records promptly available to any person," 5 U.S.C. § 552(a)(3)(A), unless "the agency reasonably foresees that disclosure would harm an interest protected by an [enumerated] exemption," *id.* § 552(a)(8)(A)(i)(I). Exemption 6 provides that an agency need not disclose "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." *Id.* § 552(b)(6). When an enumerated exemption is implicated, an agency must still disclose "[a]ny reasonably segregable portion of a record . . . after deletion of the [exempt] portions." *Id.* § 552(b).

## A.

As a threshold matter, the parties contest whether the emails from which the Department is redacting the names and email addresses at issue qualify as "similar files" under Exemption 6. The Department contends that the "files at issue here" are "similar files" because the "names and email addresses of working-level employees . . . who worked on or communicated about a particular matter" can "be used to identify—and directly contact—particular individuals." TPPF argues that "official policy communications do not transform into 'similar files' simply because they include the names of employees or the email addresses they use for official business developing that policy." Though we need not, and do not, decide this issue, we provide

some context for the proposition that these emails are "similar" to "personnel and medical files."

In *U.S. Department of State v. Washington Post Company*, the Supreme Court held that State Department records indicating the citizenship status of certain individuals were "similar files." 456 U.S. 595, 602 (1982). The Court reasoned that the records "presumably would . . . contain[] much of the same kind of [nonintimate] information" contained in personnel and medical files, like "place of birth, date of birth, date of marriage, employment history, and comparable data." *Id.* at 600–01. The Court rejected the argument that "the phrase 'similar files' . . . is limited to files containing 'intimate details' and 'highly personal' information." *Id.* at 600 (citations omitted). Instead, the Court concluded that Congress intended "the phrase . . . to have a broad, rather than a narrow, meaning." *Id.* In essence, Exemption 6 "was intended to cover detailed Government records on an individual which can be identified as applying to that individual." *Id.* at 602 (alterations accepted) (citation omitted). Therefore, "[w]hen disclosure of information which applies to a particular individual is sought from Government records, courts must determine whether release of the information would constitute a clearly unwarranted invasion of that person's privacy." *Id.*

In the years since the Court decided *Washington Post*, the Supreme Court, this court, and our sister circuits have focused on the opinion's language regarding information "about particular individuals" and "which applies to a particular individual." *Id.* at 600, 602; *see, e.g.*, *Ray*, 502 U.S. at 173; *Sherman*, 244 F.3d at 361; *Rojas v. FAA*, 941 F.3d 392, 405 (9th Cir. 2019). Last year, the Fourth and Ninth Circuits ostensibly followed those precepts to hold that Exemption 6 allowed for the redaction of employee names and email addresses from disclosed emails. *Empower Oversight Whistleblowers & Rsch. v. NIH*, 122 F.4th 92, 107 (4th Cir. 2024); *Pomares v.*

*Dep't of Veterans Affairs*, 113 F.4th 870, 883–85 (9th Cir. 2024). In those cases, however, the FOIA requesters did not press, and the courts did not engage, the "similar files" issue. *See, e.g.*, *Empower Oversight*, 122 F.4th at 107 (citing only another Fourth Circuit case in which neither the FOIA requester nor the court engaged the issue). No other circuit has addressed the specific issue presented here, though some district courts have concluded that files containing information like employee names and work telephone numbers "ordinarily [are] not considered 'similar files' for purposes of Exemption 6." *Friedman v. U.S. Secret Serv.*, 923 F. Supp. 2d 262, 282 (D.D.C. 2013); *see also, e.g.*, *Gahagan v. DOJ*, No. CIV.A. 13-5526, 2014 WL 2158479, at *6 (E.D. La. May 23, 2014) (Engelhardt, J.) ("Exemption 6 has been found inapplicable to such information [as names, email addresses, and phone numbers] insofar as it pertains to government agency employees.").

As noted above, it is unnecessary for us to determine whether the emails at issue are similar to personnel and medical files for purposes of Exemption 6. Even assuming they are "similar files," disclosure of the underlying information does not "constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).

## B.

FOIA creates a "strong presumption in favor of disclosure." *Ray*, 502 U.S. at 173. And Exemption 6 creates a "stricter standard" than do other FOIA exceptions to that default setting. *DOJ v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 756 n.9 (1989). "[U]nder Exemption 6, the presumption in favor of disclosure is as strong as can be found anywhere in the Act." *Wash. Post Co. v. HHS*, 690 F.2d 252, 261 (D.C. Cir. 1982). Exemption 6 allows an agency to withhold information contained in a covered file only if its disclosure "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6); *cf. id.* § 552(b)(7)(C) (allowing agency to

withhold information contained in law-enforcement records if disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy").

To determine whether Exemption 6 allows an agency to withhold requested information, a court must "balance 'the individual's [interest in] privacy' against the basic policy of opening 'agency action to the light of public scrutiny.'" *Ray*, 502 U.S. at 175 (quoting *Rose*, 425 U.S. at 372). First, the court must "identify and evaluate the specific privacy interests implicated by the information." *Halloran v. Veterans Admin.*, 874 F.2d 315, 319 (5th Cir. 1989). Next, the court must determine "the extent to which disclosure of the information sought would shed light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to." *DOD v. FLRA*, 510 U.S. 487, 497 (1994) (cleaned up). Finally, the court must "perform the actual weighing of the interests for and against disclosure." *Halloran*, 874 F.2d at 319. The agency bears the burden of establishing that "the overall privacy interests of the individual clearly outweigh the presumption of public disclosure." *Sherman*, 244 F.3d at 361.

**1.**

In arguing that significant privacy interests are at stake, the Department observes that "the disclosure TPPF seeks would associate [particular Department employees] with a high-profile and controversial policy and would facilitate direct contact of these individuals through their disclosed email addresses." The Department argues that its employees have a significant interest in avoiding "unwanted attention"—be it in the form of receiving "harassing messages," being contacted for research purposes, having "their backgrounds" "indirectly investigate[d]," or being "described in the media." And the Department takes the position that these interests are heightened for "working-level officials without decision-making

authority." The Department also raises the possibility that vengeful third parties would publicize private information about its employees (i.e., "dox" them).

TPPF argues that these asserted privacy interests are speculative, conclusory, and not individualized. It also contends that the Department did not make its "doxing" argument below. But TPPF's main argument is that "[f]ederal employees do not have a legitimate privacy interest in shielding their activities as public servants from public scrutiny."

The Department has not cited any Exemption 6 case holding that government employees have a significant, cognizable interest in keeping private the fact that they worked on a "controversial matter." The Department comes closest with three out-of-circuit cases it cites, but all are readily distinguishable. In the first, the D.C. Circuit concluded that FDA employees who worked on the approval of the abortion drug mifepristone had a privacy interest in being safe from "abortion-related violence." *Jud. Watch, Inc. v. FDA*, 449 F.3d 141, 153 (D.C. Cir. 2006). In the second, the Ninth Circuit concluded that Forest Service employees had a privacy interest in avoiding the harassment, embarrassment, and stigma that could result from being revealed to have participated in the heavily criticized response to a wildfire that killed two Forest Service firefighters. *Forest Serv. Emps. for Env'tal Ethics v. U.S. Forest Serv.*, 524 F.3d 1021, 1026 (9th Cir. 2008). In the third, the Ninth Circuit held that federal employees with knowledge of "particular vulnerabilities involving dangerous biological agents and toxins at a single biolab" had a "nontrivial privacy interest" in avoiding the harassment and threats that could come from "a nefarious person interested in the specific toxins handled" at the lab. *Civil Beat Law Ctr. for the Pub. Int., Inc. v. CDC*, 929 F.3d 1079, 1091–92 (9th Cir. 2019). Taken together, these cases stand for the proposition that government employees have some level of privacy interest in being protected from proven danger, public association

with a fatal and heavily criticized incident, and targeting by bad actors for highly sensitive information. None of those concerns are present here.

The Department also cites an Exemption 7(C) case in which the D.C. Circuit determined that "public identification of the [agents] involved in the FBI's investigation of Dr. [Martin Luther] King would constitute an unwarranted invasion of their privacy in light of the contemporary and controversial nature of the information." *Lesar v. DOJ*, 636 F.2d 472, 487–88 (D.C. Cir. 1980). But that case is likewise distinguishable, because (1) the question in *Lesar* was whether the privacy invasion would be "unwarranted" under Exemption 7(C), rather than "clearly unwarranted" under Exemption 6; (2) the court "discern[ed] no countervailing public interest in disclosing [the names]" more than a decade after the fact; and (3) the case concerned a highly charged matter: an FBI investigation of a venerated and since-assassinated civil-rights leader that "took on the nature of a campaign to harass and attempt to discredit" him. *Id.*

Quoting *Niskanen Center v. FERC*, 20 F.4th 787, 791 (D.C. Cir. 2021), the Department asserts that "government employees have a 'significant privacy interest' in their names where, as here, 'the information sought [is] of a type that might invite unwanted intrusions.'" But *Niskanen Center* concerned the names *and home addresses* of private citizens, not government employees, and the cases on which that case relied also concerned the disclosure of names and home addresses. *See id.* at 791–92. A home address is a more sensitive piece of information than a work email address. *See FLRA*, 510 U.S. at 501 (noting, in an Exemption 6 analysis, that "the privacy of the home . . . is accorded special consideration in our Constitution, laws, and traditions").

All told, the Department has not established that its employees have a significant interest in keeping private the fact that they participated in, and

made particular contributions to, the development of a national emissions reduction pledge. Contrary to the Department's suggestion, public servants generally have no cognizable interest in not being "investigated, described in the media, or contacted based on their" work or otherwise receiving "unwanted attention." *Cf. Reps. Comm.*, 489 U.S. at 774 ("FOIA's central purpose is to ensure that the Government's activities be opened to the sharp eye of public scrutiny . . . ." (emphasis omitted)); *Lissner v. U.S. Customs Serv.*, 241 F.3d 1220, 1223 (9th Cir. 2001) ("[I]ndividuals do not waive all privacy interests in information relating to them simply by taking an oath of public office, but by becoming public officials, their privacy interests are somewhat reduced." (internal citation omitted)).

And while many Americans may have strong views on energy policy, the Department has not established a sufficient likelihood that disclosure would result in harassment, especially given the recently announced withdrawal from the Paris Agreement. The only "harassment" incident that the Department describes involved a handful of unpleasant replies (e.g., "criminals," "Climate Cult," and "nazi secret group") to a 2023 Republican Party tweet about John Kerry's declining to "identify the senior staff working in his office." The only doxing incident the Department proffers involved a Twitter account's posting the "names, hometowns, occupations, and employers" of President Trump's campaign donors in 2017. These distinguishable illustrations do not persuade us that disclosure here poses "threats to privacy interests more palpable than mere possibilities." *Rose*, 425 U.S. at 381 n.19. Ultimately, the Department has not shown that the previous administration's development of a never-binding and now-abandoned emissions reduction target is a matter so controversial as to raise creditable concerns that members of the public will harass and/or dox the State Department employees implicated by TPPF's FOIA request.

Further, these Department employees have little, if any, privacy interest in shielding their government-issued email addresses from being disclosed and publicly associated with development of the 2021 Paris Agreement climate pledge.  Exemption 6 expressly protects against "clearly unwarranted invasion[s] of *personal* privacy" that would result from disclosure of certain information contained in agencies' personnel, medical, and similar files.  5 U.S.C. § 552(b)(6) (emphasis added).  A common-sense reading of the statutory text therefore reveals what the Supreme Court has deduced from legislative history:  "Congress' primary purpose in enacting Exemption 6 was to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of *personal* information." *Wash. Post*, 456 U.S. at 599 (emphasis added); *see also id.* at 599–600 ("[T]he primary concern of Congress in drafting Exemption 6 was to provide for the confidentiality of *personal* matters." (emphasis added) (quoting *Rose*, 425 U.S. at 375 n.14)).

The Department's position that Exemption 6 shields agency email addresses because its employees have significant privacy interests in them is hard to square with the fact that TPPF's request does not implicate Department employees' "personal information" or "personal matters." Rather, TPPF's request seeks the email addresses of government-issued (and -monitored) accounts that federal employees use to conduct official business.  The Department does not address that tension.  At least in this context, where there is scant substantiated threat of harassment, we are not convinced that disclosing official email addresses "would constitute a[n] . . .

invasion of personal privacy," let alone a "clearly unwarranted" one.  5 U.S.C. § 552(b)(6).[12]

**2.**

We turn now to the other side of the ledger—"the extent to which disclosure of the information sought would . . . let citizens know what their government is up to." *FLRA*, 510 U.S. at 497 (citation and internal quotation marks omitted).  TPPF asserts that the public has a "right to know *who* participated in the development of [the climate] pledge."  With employee names, TPPF explains, the public could ascertain participating employees' seniority, "backgrounds, affiliations, and expertise."  TPPF reasons that the public could thereby gain insight into, for example, "the extent to which the Department relied on [policy] experts, rather than non-subject matter experts, in developing the pledge."  TPPF also offers that knowing both employees' names and their official email addresses is "very important for follow-up requests," as having that information helps requesters formulate "narrower . . . FOIA requests that are far less burdensome to the agency and more helpful to the public."  This purportedly "makes it a lot easier to get responsive documents from the Government," including through requests for specific employees' emails about the Paris Agreement or with people who have been "lobbying the [G]overnment regarding the climate pledge."

The Department responds that, because the employees whose names and email addresses the Department is withholding were not decisionmakers for the agency, disclosing their identities would not illuminate "what the government is up to."  *See FLRA*, 510 U.S. at 497.  The Department further points out that, as it is, "TPPF has proved fully capable of formulating

---

[12] Moreover, any unwelcome consequences of email address disclosure can be mitigated by technical means and, if necessary, the issuance of new email addresses.

FOIA requests to seek the material it desires." The Department contends that "the identities [and] email addresses of the working-level employees" that TPPF seeks "can be used to facilitate fishing expeditions for additional records that may not exist and that could, in any event, be obtained without the requested disclosures."

After the close of merits briefing, we asked the parties to file letter briefs addressing the impact on this case of President Trump's Executive Order 14162, which initiated the country's latest withdrawal from the Paris Agreement. The Department's position is that any public interest in disclosure of the information it is withholding "has been diminished" because of the President's order. TPPF counters that President Trump's decision only "highlights the continuing strong public interest in the United States' participation in the Paris Agreement." TPPF contends that there remains a "substantial interest" in "understanding how policies under th[e] Agreement—like the climate pledge—were developed" because it is "highly likely" that "a future president might seek to rejoin the Paris Agreement and implement a new climate pledge."

We agree with aspects of both parties' positions. President Trump's action has, to some degree, lessened the salience of publishing the withheld information. By the same token, the public retains an interest in understanding the Department's past (and possibly future) process for developing the emissions reduction target. On balance, TPPF has the better of the argument.

Most fundamentally, the Department is wrong that disclosing the identities of employees who lack policymaking authority would provide no insight into government operations. Knowing the identity of those actors would help the public learn—through open-source research, for example— the seniority, backgrounds, and areas of expertise of those Department

employees who worked to commit the United States to the goal of achieving a substantial reduction in emissions by 2030.[13]  Moreover, the Department has failed to rebut TPPF's contention that having the information it seeks would help TPPF and others craft more precise follow-up FOIA requests.  To be sure, TPPF stated at oral argument that the names are "the critical part," and that having the email addresses "in order to make targeted follow-up requests . . . would just help [TPPF] narrow the scope."  But the Department has not effectively contested TPPF's position that disclosing email addresses would provide at least some marginal public benefit.  To the contrary, it stands to reason that records produced in response to FOIA requests that include specific email addresses provide the public readier insight into agency operations while placing less demand on agency resources.  It is no answer for the Department simply to say that the FOIA-requesting public can get by just fine as is.

**3.**

Balancing the interests, and mindful of FOIA's "strong presumption in favor of disclosure," *Ray*, 502 U.S. at 173, we conclude that producing the information TPPF seeks would not "constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6).  The Department has

_____

[13] The Department argues that this case does not present "a cognizable public interest in the derivative use of personal information."  In support of that argument, the Department quotes a concurring opinion in which Justice Scalia wrote that "the focus, in assessing a claim under Exemption 6, must be solely upon what the requested information *reveals*, not upon what it might lead to."  *Ray*, 502 U.S. at 180 (Scalia, J., concurring in part and concurring in the judgment).  But Justice Scalia also wrote in that opinion that "derivative use on the public-benefits side[] and derivative use on the personal-privacy side must surely go together."  *Id.* at 181. So, as TPPF explains, the Department is fighting an uphill battle with its derivative-use argument, seeing as most, if not all, "of [its] proffered privacy interests involve potential derivative harms:  the possibility that TPPF or others might use the names and email address[es] to investigate, publicize, or contact the employees."

thus not met its burden of establishing that "the overall privacy interests of [its employees] clearly outweigh the presumption of public disclosure." *Sherman*, 244 F.3d at 361; *see Wash. Post*, 690 F.2d at 261 ("[U]nder Exemption 6, the presumption in favor of disclosure is as strong as can be found anywhere in the Act."). So, the Department must disclose the names and email addresses that it is currently withholding.

## IV.

For the foregoing reasons, we REVERSE the district court's summary judgment for the Department and RENDER judgment in favor of TPPF as to the applicability of FOIA's Exemption 6. This case is REMANDED for further proceedings consistent with this opinion.

No. 24-50189

HAYNES, *Circuit Judge*, dissenting:

I respectfully dissent from the majority opinion, as I would affirm the district court as to the names and email addresses of State Department employees without policy-making authority who worked on the Biden administration's now-rescinded greenhouse-gas-reduction target. I agree with the district court that those names and email addresses may be redacted from the Department's records under FOIA's Exemption 6.[1]

Importantly here, the employees at issue did not have "policy-making authority" but instead were "career civil service employees," "mid-level foreign service employees," and "non-decision-making policy experts." The names and email addresses of employees with policy-making authority have been provided, so our opinion is addressing only non-policy-making employees who could be subject to harm or harassment if their names and email addresses were provided. Also importantly here, while TPPF says this is not a controversial situation, I disagree with that because climate policy, including the greenhouse-gas-reduction target, is a high-profile and controversial matter.

Turning to the law, FOIA provides that a federal agency "shall make [requested] records promptly available to any person," 5 U.S.C. § 552(a)(3)(A), unless "the agency reasonably foresees that disclosure would harm an interest protected by an [enumerated] exemption," *id.* § 552(a)(8)(A)(i)(I). Exemption 6 covers "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." *Id.* § 552(b)(6). Determining whether

---

[1] I do not dissent from the majority opinion's conclusion that this issue has not been mooted by the Trump administration's recission of the reduction target because TPPF continues to seek information related to it. Both sides agreed that this appeal is not moot.

Exemption 6 applies requires courts "to balance the individual's right of privacy against the basic policy of opening agency action to the light of public scrutiny." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 175 (1991) (internal quotation marks and citation omitted).

## I

The phrase "similar files," as used in Exemption 6, has "a broad, rather than a narrow, meaning." *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 600 (1982) (holding that records indicating citizenship status constitute "similar files"). It is not limited to "a narrow class of files containing only a discrete kind of personal information." *Id.* at 602. For example, in *Ray*, the Supreme Court allowed the Department to redact from interview summaries the names and other identifying information of persons who had been involuntarily returned to Haiti. 502 U.S. at 168. Indeed, the phrase "similar files" "encompass[es] virtually all data that relate to an individual." *Pierce v. Dep't of U.S. Air Force*, 512 F.3d 184, 191 (5th Cir. 2007) (quoting *Tobey v. NLRB*, 40 F.3d 469, 472 (D.C. Cir. 1994)). "This makes sense because under Exemption 6 a broad range of documents are applicable, but there is a limiting second step of weighing the individual's privacy interest versus the interest in public disclosure." *Id.*; *see also Tobey*, 40 F.3d at 472 ("Echoing the United States Supreme Court, [the en banc D.C. Circuit] characterized the threshold test for what constitutes similar files under [E]xemption 6 as a minimal one, requiring only that they contain information which applies to a particular individual." (internal quotation marks and citation omitted)).

Because emails and names fall under the broad umbrella of data that "relate to an individual," the requested records constitute "similar files" under Exemption 6. I therefore turn next to the balancing test.

No. 24-50189

## II

According to the majority opinion, providing the public access to the names and email addresses of the people who worked on the reduction target outweighs any individual privacy interest that those people might have. It reaches this conclusion even though these people did not have policy-making authority and, even more importantly, the reduction target at the core of this request has since been rescinded by the current president. Thus, in this context, there is no valid reason to expose the names and email addresses of non-policy-making employees.

## A

Because this is a controversial situation and these are non-policy-making employees, I respectfully, but strongly, disagree with the majority opinion's conclusion that there is "little, if any," privacy interest here.[2] Our sister circuits have recognized privacy interests in similar circumstances and permitted agencies to redact their employees' identities from FOIA responses. *See, e.g.*, *Jud. Watch, Inc. v. FDA*, 449 F.3d 141, 153 (D.C. Cir. 2006) (holding that FDA employees who worked on the approval of an abortion drug had a privacy interest where disclosing their names and addresses could expose them to the risk of abortion-related violence); *Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*, 524 F.3d 1021, 1026 (9th Cir. 2008) (holding that forest service employees involved in a heavily criticized wildfire response that resulted in fatalities had a privacy interest where disclosing their association with the event could expose them to potential harassment); *Civil Law Beat Ctr. for the Pub. Int., Inc. v. CDC*, 929 F.3d 1079, 1091–92 (9th Cir. 2019) (holding that "specific CDC employees who have

---

[2] I am not saying that the names and email addresses of employees with policy-making authority must always be provided. I am focused only on the facts of this case.

20

knowledge of particular vulnerabilities involving dangerous biological agents and toxins at a single biolab . . . that have garnered attention from the press and the public," have a privacy interest because disclosing their identities could expose them to potential harassment or targeting by persons with "nefarious intentions").

The majority opinion tries to trace a bright-line rule through those cases to conclude that there are no privacy concerns here. But it is unable to do so without gerrymandering a line that is a mere recitation of the varied facts from all three different cases. Here is its formulation: "government employees have some level of privacy interest in being protected from proven danger, public association with a fatal and heavily criticized incident, and targeting by bad actors for highly sensitive information."

I see a more straightforward line running through those cases: A government employee has a valid privacy interest if the employee's involvement in a certain assignment is not public knowledge and disclosure of that involvement would expose the employee to potential harassment or danger. As I've said, such an interest is clearly implicated here, even more so because the employees at issue did not even have policy-making authority. TPPF itself describes climate policy as "one of the most high-profile and controversial issues facing our country today." It adds that "[f]ew national issues are as complex and contested as the topic of climate change and climate change policy." So, the majority opinion's conclusion that the employees' privacy concerns are merely speculative is at odds with TPPF's own rhetoric. As I see it, TPPF's persistence in seeking the names and email addresses of the individuals who worked on a since-rescinded climate policy only underscores the validity of the privacy concerns at issue here. Assuming that TPPF does not mean to harm them, nonetheless, exposing their names and email addresses in this context has a strong chance of leading to harm or harassment by others.

No. 24-50189

## B

Second, the rescission of the reduction target greatly diminishes the public's interest in the names and email addresses of the non-policy-making employees who worked on it.  Even the majority opinion acknowledges that.  Nonetheless, it asserts that knowing the names and email addresses of those employees would help TPPF craft narrower follow-up requests.  But for what?  The emissions-reduction target has been rescinded.  Also, FOIA already requires agencies to search for responsive documents by using methods that can be reasonably expected to produce all documents relevant to the request, *Batton v. Evers*, 598 F.3d 169, 176 (5th Cir. 2010), and TPPF does not contend that the Department fell short of that obligation.  This argument therefore warrants very little weight, if any, in the balancing of interests.

*      *      *

In sum, the Department employees' privacy interest in having their names and email addresses redacted from the records clearly outweighs the de minimis benefit TPPF or the public would gain from that information.  I therefore respectfully dissent.